2023 IL App (1st) 211526
No. 1-21-1526
Opinion filed: May 8, 2023

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| MAURO GLORIOSO, | ) | Appeal from the Circuit Court of |
| | ) | Cook County, Illinois |
| Plaintiff-Appellee, | ) | |
| | ) | No. 2021 L 000090 |
| v. | ) | |
| | ) | The Honorable |
| SUN-TIMES MEDIA HOLDINGS, LLC, and | ) | Patricia O'Brien Sheahan, |
| TIM NOVAK, | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellants. | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Hyman and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff-appellee Mauro Glorioso filed a complaint alleging defamation *per quod*, defamation *per se*, false light invasion of privacy, and intentional infliction of emotional distress arising from two sets of articles published in print and online in the Chicago Sun-Times and written by Tim Novak. Defendants-appellants Sun-Times Media Holdings, LLC, and Tim Novak (collectively "Sun-Times") filed what are essentially three pretrial motions: (1) a March 5, 2021, motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure 735 ILCS 5/2-619.1 and a July 28, 2021, combined motion to (2) reconsider the denial of their section 2-619.1 motion

to dismiss, or (3) in the alternative, to dismiss pursuant to the Citizen Participation Act (Act) (735 ILCS 110/1 *et seq.* (West 2020)).

¶ 2 At issue in the (1) motion to dismiss and the (2) reconsideration argument of the subsequent combined motion are Glorioso's claims of defamation *per quod*, defamation *per se*, false light invasion of privacy, and intentional infliction of emotional distress.

¶ 3 At issue in the (3) alternative motion to dismiss pursuant to the Act is whether Glorioso's defamation suit is an impermissible retaliatory "Strategic Lawsuits Against Public Participation" or "SLAPP" as defined by the Act.

¶ 4 The circuit court dismissed Glorioso's claim of intentional infliction of emotional distress but denied all remaining portions of the Sun-Times's motions.

¶ 5 For the reasons that follow, we affirm the circuit court's May 25, 2021, denial of (1) the motion to dismiss as to the defamation *per quod*, defamation *per se*, and false light invasion of privacy and agree with the court that these issues have met the requirements to survive the pleading stage. We remand those issues to the circuit court with no prediction or comment on the outcome.

¶ 6 For the reasons that follow, we also affirm the circuit court's October 29, 2021, order denying (2) the motion to reconsider or (3), in the alternative, to dismiss the lawsuit under the Act and find that the underlying suit is not a SLAPP.

¶ 7 I. BACKGROUND

¶ 8 The underlying matter arises from a January 5, 2021, defamation suit filed by Glorioso against the Sun-Times, alleging counts of defamation *per quod*, defamation *per se¸* false light invasion of privacy, and intentional infliction of emotional distress over two articles published by the Chicago Sun-Times on their website and print newspaper on February 7, 2020; February 9, 2020; October 9, 2020; and October 11, 2020. The articles reported on an investigation by the

Illinois Office of Executive Inspector General (OEIG) into the Illinois Property Tax Appeal Board (PTAB or Board) and its handling of the 2011 property tax appeal of the Trump International Hotel and Tower (Trump Tower) in Cook County, Illinois. On November 13, 2019, an anonymous whistleblower filed a complaint with the OEIG (OEIG Complaint), naming several individuals at PTAB and alleging that the Trump Tower tax assessment was severely reduced for politically motivated reasons.

¶ 9                                  A. The OEIG Complaint

¶ 10    The November 13, 2019, OEIG Complaint lists five individuals against whom the complaint was brought: Steven Waggoner, Mauro Glorioso, Katherine Patti, Simeon Nockov, and Jennifer Vesely. At the time of the activities alleged in the OEIG Complaint, Waggoner was the acting executive director of PTAB and its chief administrative law judge (ALJ). Glorioso was the chairman of PTAB and became the executive director of PTAB on March 27, 2019. The executive director oversees the day-to-day operations of PTAB, including its ALJs, and may review appeals and recommend decisions. Patti, Nockov, and Vesely were PTAB ALJs. ALJs conduct hearings and prepare written decisions on property tax assessment appeals, but PTAB makes the final determination based on a majority vote of its members.

¶ 11    According to the OEIG Complaint, ALJs Patti, Nockov, and Vesely worked together handling the Trump Tower property tax appeal between 2017 and 2018. Nockov, with the help of Patti and Vesely, wrote a decision finding that the property did not warrant a property tax reduction. On January 31, 2018, he entered the decision into PTAB's database, which meant that the decision was ready for presentation to the appointed members of the Board for approval.

¶ 12    The OEIG complaint alleges that Nockov told various PTAB employees that shortly after he entered his decision on the Trump Tower appeal, Glorioso told Waggoner that he wanted a

large reduction in the assessment of Trump Tower because the owner of the property was the president of the United States. Waggoner then allegedly told Nockov to withdraw his decision and rewrite it to grant a large assessment reduction because the president was the owner and to "Make America Great Again."[1] Nockov withdrew his decision and, again with the assistance of Patti and Vesely, rewrote the decision so that it granted a reduction in the property tax assessment. Nockov entered the new decision into PTAB's database on June 29, 2018. However, according to the complaint, Waggoner had the decision withdrawn later the same day. Waggoner then allegedly took over handling the appeal himself, entering a third draft of the decision into the PTAB database on April 29, 2019, now granting a reduction of several million dollars on the Trump Tower property tax assessment, which was allegedly more in line with what Glorioso sought from Waggoner. However, Nockov allegedly confirmed that Glorioso had Waggoner pull this draft as well because he felt it was not the right time to publish the decision; the decision was pulled from the database on May 7, 2019. The OEIG Complaint concludes by stating that, as of the time of filing the complaint, no written decision on the Trump Tower property tax assessment had been issued.

¶ 13    The allegations specific to Glorioso accuse him of telling Chief ALJ Waggoner that he wanted a large reduction in the Trump Tower assessment because the owner was the president; Waggoner describing Glorioso's justification as the owner being the president and to "Make America Great Again"; Waggoner finding that the large reduction Glorioso sought was warranted; and Glorioso deciding to pull the decision granting the reduction because he felt the timing was not right.

---

[1]It is unclear from the OEIG Complaint whether the "he" who wanted the reduction because it was for the president and "to Make America Great Again" refers to Waggoner or Glorioso.

¶ 14    The Sun-Times learned of the OEIG Complaint when an anonymous source delivered a copy of the complaint to Sun-Times investigative reporter Tim Novak on or around December 23, 2019. Novak served PTAB with a request, pursuant to the Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2018)), to obtain all communications between PTAB and OEIG relating to the 2011 Trump Tower property tax appeal; the request was denied on January 21, 2020. Glorioso was named in the response from PTAB as one of the individuals who determined that the documents requested were exempt from FOIA; he was identified as the PTAB executive director and general counsel.

¶ 15                    B. The OEIG Investigation

¶ 16    OEIG opened an investigation based on the allegations of the OEIG Complaint in 2019, captioned In re: Mauro Glorioso, Case No. 19-02400. While he was unable to receive confirmation of the investigation from his FOIA request, Novak received an e-mail statement from Emily Bittner, the communications director for the governor of Illinois, which stated:

> "The administration is determined to get to the bottom of what happened in this situation, and will ensure that a thorough investigation is conducted. PTAB should take no action until an investigation is complete. In general, it would be entirely inappropriate for a legal decision on a property tax appeal to be impacted by any of the conduct alleged in this complaint, including the allegations of political motivations improperly driving the decision making."

¶ 17    The Executive Ethics Commission of the State of Illinois published a redacted version of the OEIG final report in *In re: Mauro Glorioso* (OEIG Final Report) on September 23, 2021. The OEIG final report confirmed that Glorioso had been under investigation, but redacted all information relating to the OEIG Complaint on the basis that OEIG found the allegations to be

unfounded. However, it also included information about a second complaint, received on October 15, 2020, which alleged that on October 5, 2020, Glorioso improperly deleted all of his e-mails relating to the 2011 Trump Tower property tax appeal, as well as additional related files on his PTAB computer and from office-wide computer systems. OEIG found that Glorioso had been notified through various means in February of 2020 about a document hold requiring him to retain all documents and electronically stored information relating to the 2011 Trump Tower appeal until instructed that the document hold was over.

¶ 18    Based on the investigation, OEIG Final Report found that Glorioso violated PTAB policy, directives, and state law relating to the maintenance of records by deleting PTAB files and e-mails. Glorioso was terminated from his position on September 23, 2020. On October 5, 2020, PTAB announced internally that Glorioso would leave the agency on October 23, 2020. However, due to the aforementioned misconduct, that date was moved up to October 14, 2020. As Glorioso was no longer employed by the State, OEIG recommended that a copy of its report be placed in his employment file and that he not be rehired by the State.

¶ 19    On June 8, 2021, PTAB issued a unanimous Final Administrative Decision on the 2011 Trump Tower appeal, finding that a reduction of $2,167,996 in the valuation of the property was warranted.

¶ 20                    C. The Sun-Times's Reporting on Glorioso

¶ 21    On February 7, 2020, the Chicago Sun-Times published on its website an article written by Novak, titled "President's Chicago Tax Appeal on Trump Tower Is Under Investigation," with the subheading of "State inspector general, Pritzker administration are looking into allegation a Republican state agency head pressured staff to slash by $1M the $2.5M in property taxes Donald Trump paid in 2012." Tim Novak, *President's Chicago Tax Appeal on Trump Tower Is Under*

*Investigation*, Chicago Sun-Times (Feb. 7, 2020), https://chicago.suntimes.com/2020/2/7/21126855/donald-trump-tower-chicago-property-tax-appeal-investigation [https://perma.cc/5VEN-YCLQ]. The article states that OEIG was investigating Glorioso based on an anonymous complaint that Glorioso pressured his staff to rule in Trump's favor on his 2012 Trump Tower tax appeal, rejecting his staff's decision to deny Trump any refund. *Id.* It describes Glorioso as a "Republican attorney from Westchester." *Id.* The article further states that the Sun-Times filed a public records request with PTAB for "correspondence among the inspector general, Glorioso, chief PTAB administrative law judge Steven Waggoner and hearing officer Simeon Nockov." *Id.* The article also quotes Bittner's statement to Novak, as well as stating that PTAB rejected the Sun-Times' FOIA request and Glorioso and Waggoner declined to comment. *Id.* It also states that OEIG would not confirm whether it had received a complaint regarding Glorioso and Trump's appeal and that Governor Pritzker's staff would not confirm that a complaint had been filed "against Glorioso and four members of Glorioso's staff." On February 9, 2020, the Sun-Times republished the article in its print edition.

¶ 22 On October 9, 2020, the Chicago Sun-Times published on its website another article by Novak regarding Glorioso, this one titled "Pritzker Dumps Official Who Pushed for Trump to Get $1 Million Refund on Chicago Tower's Taxes." Tim Novak, *Pritzker Dumps Official Who Pushed for Trump to Get $1 Million Refund on Chicago Tower's Taxes*, Chicago Sun-Times (Oct. 9, 2020) https://chicago.suntimes.com/2020/10/9/21509933/trump-tower-chicago-property-tax-dispute-pritzker-mauro-glorioso-illinois-property-tax-appeal-board [https://perma.cc/MSV5-UZ3M]. The subheading reads, "Mauro Glorioso, a Westchester Republican the governor appointed to head the Illinois Property Tax Appeal Board, is under a state investigation over his Trump Tower recommendation." *Id.* The article states that Glorioso was under investigation for "trying to force

a state agency to give President Donald J. Trump a refund of more than $1 million on the property taxes he paid on his Chicago skyscraper." The article further states that the investigation was based on an anonymous complaint claiming that Glorioso "ordered the agency to approve the $1 million payout for Trump, rejecting a staff report that found no valid reason to support the refund." *Id.* Another quote from the article claims that "[a]ny tax refund for Trump would come out of property taxes to the city of Chicago and eight other government agencies, the Chicago Public Schools losing the biggest chunk of money: more than $540,000 if the president gets what Glorioso wants." *Id.* The article also describes Glorioso and his actions as follows: "The 64-year-old Westchester resident and staunch Republican rejected a report from hearing officer Simeon Nockov, who found that Trump didn't merit a refund ***." *Id.* The article also notes that Waggoner had found Trump to be entitled to a refund because the Trump Tower property had been over-assessed in 2011 and recommended a reduced valuation of the property, which would result in a reduction in property taxes from $2.5 million to $1,031,350. The Sun-Times republished the article in its print edition on October 11, 2020.

¶ 23                              D. The Defamation Suit

¶ 24    Glorioso filed his defamation suit against the Sun-Times and Novak on January 5, 2021, alleging, across nine counts, defamation *per quod*, defamation *per se*¸ false light invasion of privacy, and intentional infliction of emotional distress against both parties. The two counts of defamation *per quod* relate specifically to the February 7 and 9 articles, while the two counts of defamation *per se* relate specifically to the October 9 and 11 articles. The remaining causes of action relate to all of the articles.

¶ 25    Regarding the defamation *per quod* counts, Glorioso claims that Novak, having received a copy of the OEIG Complaint, wrote the February 7, 2020, article, knowing that it was materially

false, specifically because the complaint did not state that Glorioso "pressured his staff to cut the president a break"; "pressured his staff to rule in the president's favor" or "reject *** the [PTAB] staff's [and hearing officer's] decision to deny Trump any refund"; or directed that the adjudication of the Trump Tower property tax appeal be driven by political motivations, rather than the merits of the case. Glorioso also claims that Novak knew that in 2018, when he allegedly told Waggoner that he wanted the president to be awarded a refund, Glorioso had not yet been appointed executive director and general counsel of PTAB, and, as then-chairman of the PTAB Board, he had no direct authority over PTAB hearing officers. Glorioso further claims that Novak knowingly and falsely depicted Glorioso as

> "(i) taking wrongful action and using his authority solely for political purposes, unrelated to the merits of the Trump Tower real estate tax appeal; (ii) preventing a hearing officer's decision from becoming finalized and published pursuant to those unethical motives; and (iii) demanding a politically-based result in the PTAB appeal, unrelated to the merits of the case."

Glorioso further alleged that Novak knowingly and falsely depicted him as a corrupt political official, lacking integrity in his profession. He denies having directed that the initial decision submitted by ALJ Nockov on January 31, 2018, be rejected or that a finding in favor of Trump Tower and refunding more than $1 million be substituted in its place. Glorioso claims that, as a result of the publication of these false statements, he suffered special damages in the form of the loss of his employment as executive director and general counsel of PTAB—and the salary and benefits that came with the position—as well as damage to his reputation, humiliation, anxiety, and other mental distress.

¶ 26    Regarding the October 2020 articles, Glorioso alleges that they constitute defamation *per se* because the statements contained in the online article and its reprint were published with actual malice and portray Glorioso as lacking integrity in his profession. He cites specifically to the articles' stating that he "pushed for" and "tried to force a state agency to give" then-President Trump a $1 million refund on the Trump Tower property tax and that he was under state investigation for his Trump Tower recommendation, both of which Glorioso denies in his complaint. He further claims that the articles falsely characterize the OEIG Complaint as having alleged that Glorioso ordered PTAB to "approve the $1 million payout for Trump, rejecting a staff report that found no valid reason to support the refund on the tax bill for the Trump International Hotel and Tower's hotel and commercial space" and that the Sun-Times and Novak knew that the complaint did not make such allegations. He repeats the claims from counts I and II that the defendants were aware that Glorioso did not have the authority to direct any result in the Trump Tower appeal at the time of the alleged conduct and that the defendants distorted the contents of the OEIG Complaint in order to falsely depict Glorioso as having directed a result in a property tax appeal "solely for corrupt and political purposes, unrelated to the merit of the case." He similarly contends that the defendants used his anticipated termination and statements that he was a "staunch Republican" to distort the actions alleged in the OEIG Complaint as having been politically motivated and corrupt. Additionally, Glorioso claims that the articles' false statements that the money Glorioso wanted to save then-President Trump "would come out of property taxes to the city of Chicago and eight other government agencies, the Chicago Public Schools losing the biggest chunk of the money" implied that his actions jeopardized much-needed funding for Chicago's public schools.

¶ 27    Glorioso next alleges four counts of false light invasion of privacy, for both online articles and their reprints, on the basis that they falsely accused him of conduct showing a lack of integrity as executive director and general counsel of PTAB, which publicly depicted him in a false light. Finally, he alleges a count of intentional infliction of emotional distress, claiming that the statements the defendants published about him were extreme and outrageous, that defendants knew there was a high probability of him suffering extreme emotional distress over their publication, and that he did in fact suffer such distress.

¶ 28                              E. Sun-Times's Pretrial Motions

¶ 29                              1. *March 5, 2021, Motion to Dismiss*

¶ 30    On March 5, 2021, the Sun-Times moved to dismiss Glorioso's complaint pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2020)), arguing that the statements contained in the articles were substantially true, as to both the factual assertions and figurative or conditional language describing the gist of the investigation against Glorioso. The Sun-Times further argued that Glorioso, as a public official, failed to plead actual malice with clear and convincing evidence of the defendants' deliberate or reckless disregard of the truth, or that the Sun-Times's reporting on a public official was highly offensive, extreme, and outrageous conduct. With respect to the claims of defamation *per quod* and related derivative counts, they argued that Glorioso had failed to make a *prima facie* showing of pecuniary special damages because there was no causal connection between Glorioso's firing and the Sun-Times's reporting on an investigation of which the governor was already aware. The Sun-Times further argued that the counts relating to defamation *per se* should be dismissed because the Sun-Times's reporting was conditioned on the outcome of an official investigation, which subjected it to the innocent construction rule. As to the derivative counts of false light invasion of property and intentional

infliction of emotional distress, the Sun-Times argued that they failed because the defamation claims failed.

¶ 31     Additionally, the Sun-Times attached a declaration from Timothy Novak (Novak Declaration), the OEIG Complaint, the Bittner statement, and several e-mails. The e-mails, which the Sun-Times received from Novak's FOIA request, include a February 8, 2020, message from Glorioso to PTAB where he referred to the OEIG Complaint as containing allegations that he had sought a desired result in the Trump Tower appeal based on political bias. They also include e-mails between, variously, Glorioso, Waggoner, Nockov, and others regarding the 2012 Trump Tower appeal. Among those e-mails, the exchanges include: Waggoner telling Nockov on June 29, 2018, to wait on submitting his decision for review until Waggoner checked with Glorioso how he wanted it to proceed; Glorioso telling Waggoner on November 12, 2019, that he had reviewed the Trump Tower decision and agreed with the determination of value; and an e-mail from Glorioso to himself on February 8, 2020, listing ideas for a "letter of support for staff by board of directors" that included a denial of him having directed a particular result in the Trump Tower appeal and of having political bias, assurances that the decision was decided on the merits, and the allegations in the OEIG complaint that Glorioso sought a desired result based on political bias lacked merit.

¶ 32     The Novak Declaration states that he received a copy of the OEIG complaint and read that it accused Glorioso of telling Waggoner that he wanted a large reduction in the 2011 Trump Tower assessment because the owner was the president, that Glorioso perpetrated acts of prohibited political activities and conflicts of interest, that the reduction was for political reasons, and that Glorioso participated in the scheme. Novak further wrote that he submitted a FOIA request to PTAB and sought comment from PTAB, OEIG, the Office of the Governor, and Glorioso before

reporting on the complaint, including the complaint's request for an investigation. He received only the Bittner statement, which came from the governor's office. PTAB also issued an official statement prior to the publication of the Sun-Times articles, which Novak quoted in the October articles. The statement said that PTAB would continue the Trump Tower appeal until OEIG had completed its investigation, and PTAB would not discuss the merits until such time. Novak also noted that he reported in October that there was a potential explanation for PTAB staff replacing Nockov's original decision that was not politically motivated—that Waggoner based his recommendation of a reduced assessment on vacant storefronts on the property and the fact that interested agencies failed to object to the appeal. Novak further wrote that while he was writing the articles, he did not receive any information that contradicted any of his reporting or that would otherwise inform him that any factual statement he wrote was not true. Additionally, he stated that the contents of e-mails and other documents he received from a second FOIA request to PTAB after the publication of the articles were consistent with everything he had reported on the OEIG Complaint and investigation.

¶ 33    The exhibits were submitted to support the Sun-Times's argument that Glorioso's complaint should be dismissed pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2020)) because the articles gave a fair summation of information obtained from governmental and public proceedings on a matter of public interest, namely the OEIG Complaint and investigation. The Sun-Times further argued that the exhibits negate actual malice because the OEIG complaint that Novak based his reporting on did accuse Glorioso of prohibited politically motivated activities, as described in the articles, and the governor's office confirmed that there was an investigation into those accusations.

¶ 34    The circuit court granted in part and denied in part the motion to dismiss on May 25, 2021. The only count that was dismissed was the claim of intentional infliction of emotional distress, as the court agreed with the Sun-Times that Glorioso had failed to allege specific facts to support his claim.

¶ 35    As to the defamation *per quod* counts, the circuit court found that a reasonable jury could find that the statements from the February 2020 articles that Glorioso took issue with in his complaint were not substantially true because the jury could find that the Sun-Times exaggerated the scope of the investigation and the degree of Glorioso's authority over PTAB's deliberative process, thus presenting the "gist" or "sting" of the OEIG Complaint's accusations against Glorioso, specifically, worse than they actually were. The circuit court also noted that the Sun-Times presented the reporting not as opinion pieces, but as news. In particular, the court identified three statements published in the Sun-Times that Glorioso claimed to be false and defamatory: (1) that he was under investigation for pressuring his staff to give the president a break and rule in his favor in his property tax appeal, (2) that he rejected the ALJ's original decision to not award any refund, and (3) that he directed that a legal decision in the Trump Tower appeal be driven by political motivations, rather than the merits of the case.

¶ 36    The circuit court noted that Bittner's statement on behalf of the governor, that his office "will ensure that a thorough investigation" is conducted, did not confirm that Glorioso in particular was being investigated, or the scope and subject of any investigation into the allegations in the OEIG Complaint. The court took issue with what it deemed to be misleading statements in the articles that exaggerated Glorioso's alleged involvement in the purported scheme to reduce the then-president's property taxes because the actual OEIG Complaint merely stated that Glorioso supposedly told Waggoner he wanted a large reduction in the assessment because the owner was

the president, and that Nockov confirmed that Waggoner found the property to warrant a large, multi-million assessment reduction, "consistent with Glorioso's directive." The complaint did not accuse Glorioso of having been in charge of writing or revising a decision on the appeal, of instructing or pressuring any PTAB employees to rewrite the initial decision, or of having any administrative authority over PTAB employees, all of which were actually attributed to Waggoner. Ultimately, the court denied the Sun-Times's motion to dismiss the counts of defamation *per quod* on the grounds of substantial truth because it found that the ordinary reader could interpret the February 2020 articles as making factual assertions that Glorioso was specifically being investigated for abusing his authority over PTAB staff, and a reasonable jury could find that this was not an accurate reflection of the allegations in the OEIG Complaint.

¶ 37 As for the defamation *per se* counts, the circuit court similarly determined that a reasonable jury could find that the October 2020 articles' statements that Glorioso was "under investigation over his Trump Tower recommendation" and "trying to force [PTAB] to give President Donald J. Trump a refund of more than $1 million" and that he had "exerted pressure to force" and "ordered" PTAB to give a refund of more than $1 million, rejecting a staff report that found no valid reason to do so, were not substantially true because they exaggerated Glorioso's alleged involvement in the scheme. The court determined that it was clear that the defendants' published statements about the investigation were not consistent with the "gist" or "sting" of the allegations. The court further found that an ordinary reader could reasonably interpret the October 2020 articles as a matter of fact and infer that Glorioso was to blame for the outcome of the Trump Tower appeal, including the resulting loss of money for various government agencies, in particular Chicago Public Schools, even though, as Novak even reported, none of these government agencies challenged the appeal.

¶ 38    Regarding the Sun-Times's argument that Glorioso failed to sufficiently plead special damages because he did not allege that the governor read the Sun-Times articles before deciding to fire him, the circuit court stated that such pleading was not required, and Glorioso did not need to prove that the articles were the cause of his termination from PTAB at the pleading stage. Having determined that the articles exaggerated the allegations against Glorioso, the circuit court also rejected the argument that the investigation itself, rather than the Sun-Times's reporting on it, was an intervening cause of Glorioso's firing.

¶ 39    Finally, the circuit court addressed the Sun-Times's argument, pursuant to section 2-619 and the supporting Novak declaration, OEIG complaint, and PTAB e-mails. The court rejected the Sun-Times's attempt to apply the fair report privilege because it did not apply to statements that conveyed an erroneous impression to the ordinary reader of the allegations against and investigation into Glorioso. The court further rejected the Sun-Times's argument, pursuant to section 2-619, that the entire complaint should be dismissed because Glorioso failed to plead any facts supporting the defendants' actual malice because his pleading that the defendants knew the statements they published were false or, alternatively, published them with reckless disregard as to whether they were true or false was sufficient to survive the pleading stage, particularly since the Sun-Times had failed to convince the court that the fair report privilege or substantial truth defense applied.

¶ 40                    2. *July 28, 2021, Motion to Reconsider*

¶ 41    On July 28, 2021, the Sun-Times filed a combined motion, part of which contained an argument for reconsideration of the court's denial of Sun-Times's earlier motion to dismiss based on misapplications of the relevant law. The Sun-Times contended that its reporting was substantially true, conveying the underlying gist or sting of the contents of the OEIG complaint

and the resulting investigation, and the Sun-Times did not need to report with perfect accuracy and exact detail in order to properly argue true and fair reporting as a defense. The Sun-Times argued that the statements made regarding the investigation and OEIG complaint accurately characterized the allegations against Glorioso, based on specific quotes from the OEIG Complaint—namely, that Glorioso personally gave a "directive" to Waggoner to award a reduction for "political reasons" that constituted "prohibited unethical political activities and conflicts of interest" and that PTAB staff rewrote Nockov's original decision "consistent with Glorioso's directive." The Sun-Times contended that the circuit court took the fact that Glorioso, by necessity of how PTAB functions, needed to direct other PTAB employees to write and enter the opinion granting the reduction as evidence that Glorioso personally was not as involved in the alleged scheme, as Novak's reporting suggested.

¶ 42     The Sun-Times further noted that it used statements of conjecture—that there was an investigation into *whether* the allegations in the OEIG Complaint were true—and subjective terms such as "pushed" and "pressured" to describe the actions attributed to Glorioso. Because of its argument that its reporting was fair and substantially true, the Sun-Times contended that Glorioso could not claim actual malice.

¶ 43     Additionally, the Sun-Times asserted that Glorioso could not argue special damages because the decision to terminate his employment, as well as PTAB's announcement that he would be leaving the agency, occurred prior to the Sun-Times publishing any reporting on the OEIG complaint and the investigation. The Sun-Times further argued that the innocent construction rule protected even defamatory statements in the articles because (a) reporting on a pending investigation into *whether* any misconduct had occurred did not amount to stating that Glorioso actually did everything attributed to him in the OEIG complaint, (b) the articles offer alternative

explanations for the tax reduction, that no agencies objected to the appeal and vacant rental spaces on the property, and (c) statements that Glorioso might have acted with politically biased motivations did not accuse him of lacking qualifications or competency as executive director and general counsel of PTAB.

¶ 44     The circuit court denied the motion to reconsider on October 29, 2021, reaffirming its reasoning from the denial of the Sun-Times's previous motion to dismiss. In reaffirming that reasoning, the court identified that the Sun-Times's underlying reasoning for its arguments that the articles were substantially true, subject to an innocent construction, and privileged as fair reports and that the court identified that Glorioso failed to plead special damages with particularity was that Glorioso could not show falsity because the record showed that he was in fact under investigation. Addressing the inclusion of the OEIG final report, the circuit court stated that Glorioso was not alleging that he had not been under investigation over the Trump Tower appeal and evidence confirming that he had been was not relevant to the Sun-Times's defenses. Rather, the court characterized Glorioso's concern with the articles as pertaining to the implication that could be drawn from them—that he had specifically been the architect of the scheme or the primary target of the investigation. To that end, the circuit court again found that a reasonable jury could find that the gist of the articles was not substantially true and that the articles could not be subject to an innocent construction because the Sun-Times overstated Glorioso's involvement in and authority over PTAB's deliberative process, pointing to the articles' singling out of Glorioso by name, publishing his photo with the reporting, discussing his background and career history, and implying he was fired for his involvement in the scheme. By contrast, the court continued, the articles refer to others named in the OEIG complaint as "four members of Glorioso's staff." In reviewing the OEIG complaint, the court determined that the allegations did not suggest that

Glorioso was the architect of the alleged scheme or highlight Glorioso's culpability relative to other named individuals. The court noted that whether the publications were substantially true is a question of fact and Glorioso's pleadings were sufficient to survive a motion to dismiss at the pleading stage. Similarly, the court found that the Sun-Times had not established that the articles could not be found to convey an erroneous impression to readers and were a fair and accurate summary of proceedings, thus defeating the Sun-Times's invocation of the fair report privilege. The circuit court concluded that the erroneous message of the articles was "a combined product of Novak's omission of certain information *and* Novak's addition of his own assumption regarding Glorioso's relative culpability."

¶ 45    Regarding whether Glorioso sufficiently pled special damages, the circuit court stated that the Sun-Times was mistaken that he had to plead that the governor read the articles and decided to fire Glorioso. Rather, the court reiterated from its prior order that he did not need to prove this at the pleading stage. It was sufficient that he alleged that he lost his employment as a direct consequence of the publication of the alleged defamatory articles, which the court again held that he had.

¶ 46            3. *July 28, 2021, Alternative Motion to Dismiss Under the Act*

¶ 47    In support of its alternative argument that Glorioso's complaint should be dismissed pursuant to the Act, the Sun-Times argued that it was a meritless and retaliatory SLAPP, filed in retaliation for protected speech on public affairs. The Sun-Times claimed that Glorioso's suit met the SLAPP criteria because the same arguments for substantial truth, as well as evidence in the form of Glorioso's e-mails showing that he was aware of the contents of the OEIG complaint and characterized the accusations in line with how the Sun-Times reported on them was proof that Glorioso knowingly filed a meritless claim. The Sun-Times's other arguments were that Glorioso

filed the suit within three months of the publication of the later articles, and before the investigation concluded, and sought punitive damages for the allegedly meritless claims.

¶ 48    Shortly after briefing on the motion to reconsider or dismiss had closed, on September 23, 2021, the state's Executive Ethics Commission published the redacted final report of the investigation, stating that OEIG had found Glorioso to have violated PTAB policies and state law by deleting PTAB files and e-mails in October 2020, and recommending that he not be rehired by the State of Illinois. The Sun-Times moved to supplement the record with the OEIG final report, as further evidence that Glorioso's suit was a meritless and retaliatory SLAPP, and that the Sun-Times's reporting on the investigation as to whether Glorioso had directed a large reduction in the 2011 Trump Tower property tax appeal was true and accurate characterization of events.

¶ 49    In the same October 29, 2021, order denying the motion to reconsider, the circuit court denied the motion to dismiss the suit as a SLAPP. The court determined that the defendants had not met their burden of showing that the suit was meritless, beginning with the fact that the court had previously found Glorioso's pleadings to be sufficient, when it denied the Sun-Times's motion to dismiss. The court reiterated its rejection of the arguments the Sun-Times raised in that motion and went on to analyze whether the suit was retaliatory, finding that the facts did not reflect retaliatory intent either.

¶ 50                        II. THE PRESENT APPEAL

¶ 51    The Sun-Times now appeals from the denial of its (1) motion to dismiss and combined motion (2) to reconsider the circuit court's initial order denying its motion to dismiss, or (3) in the alternative, to dismiss the suit pursuant to the Act.[2] In its (1) original motion to dismiss, the Sun-

---

[2]The Sun-Times does not discuss the alternative motion to reconsider in its appellants' brief, focusing instead on the other argument of its combined motion, the motion to dismiss pursuant to the Act. The Sun-Times asks this court to reverse the circuit court's order. However, the arguments that the Sun-Times made in support of reconsideration in their July 2021 motion, as well as their original arguments to

Times argues that its reporting was substantially true and subject to an innocent construction and that Glorioso failed to plead actual malice or special damages.

¶ 52    In arguing for (2) reconsideration, the Sun-Times asserts that the circuit court ignored the OEIG final report, the Novak declaration, Bittner's e-mailed statement, and the e-mails received from Novak's FOIA request, particularly the e-mail from Glorioso where he characterized the complaint as alleging that he directed his desired result in the Trump Tower appeal because of political motivations. The Sun-Times again emphasizes the contents of the OEIG complaint compared to the statements published by the Sun-Times, arguing that it accurately described the complaint and investigation. It states that the OEIG complaint did claim that Glorioso, specifically, directed a politically motivated refund, that Glorioso was investigated based on those allegations, that Glorioso was fired because he violated state law by deleting records and e-mails, and that the circuit court ignored all of this in order to find that the Sun-Times should have published a take that was fairer to Glorioso and focused more on other PTAB staff members who were also mentioned in the OEIG complaint. This, the Sun-Times argued, amounted to ignoring the facts, holding the Sun-Times's reporting to an improperly high degree of scrutiny, and infringing on its editorial control and judgment in deciding what to publish. Furthermore, the Sun-Times notes that the articles do report on the involvement of other PTAB staff, notably Waggoner, and do not impute the entirety of the alleged unethical behavior in the OEIG complaint to Glorioso as the circuit court claims.

¶ 53    In its (3) motion to dismiss pursuant to the Act, the Sun-Times alternately argues, relying on the same assertions summarized above, that the articles satisfy the criteria required for immunity under the Act, and Glorioso's suit should be dismissed as a SLAPP.

---

dismiss made in their March 2021 motion to dismiss, overlap with their arguments in support of the Act immunity. Accordingly we discuss all three motions here.

¶ 54                                    III. ANALYSIS

¶ 55                              A. Standard of Review

¶ 56                                1. *Motion to Dismiss*

¶ 57     In the Sun-Times's (1) initial section 2-619.1 motion to dismiss, defendants raised the arguments that the articles were substantially true and capable of an innocent construction and that Glorioso failed to plead malice, special damages, or highly offensive, extreme, and outrageous conduct. A section 2-619.1 motion allows for a combined motion to dismiss under sections 2-615 and 2-619, as well as motions for summary judgment under section 2-1005 of the Code of Civil Procedure. *Johnson v. Matrix Financial Services Corp.*, 354 Ill. App. 3d 684, 688 (2004); see 735 ILCS 5/2-615, 2-619, 2-1005 (West 2020).

¶ 58     A section 2-615 motion to dismiss presents the question of whether the plaintiff has pled sufficient facts in the complaint to entitle him to relief if proven. *Powell v. American Service Insurance Co.*, 2014 IL App (1st) 123643, ¶ 13. In reviewing a dismissal pursuant to section 2-615, all well-pleaded facts in the complaint are taken as true and are construed in the light most favorable to the plaintiff. *Id.* A dismissal pursuant to section 2-615 is only proper where it clearly appears that no set of facts could be proved under the pleadings that would entitle the plaintiff to relief. *Id.*; *Casualty Insurance Co. v. Hill Mechanical Group*, 323 Ill. App. 3d 1028, 1033 (2001). A plaintiff cannot simply rely upon conclusions of law or fact unsupported by specific factual allegations. *Powell*, 2014 IL App (1st) 123643, ¶ 13; *Grund v. Donegan*, 298 Ill. App. 3d 1034, 1039 (1998). However, the complaint is to be liberally construed, viewed in the light most favorable to the plaintiffs. *Fox v. Seiden*, 382 Ill. App. 3d 288, 294 (2008). The standard of review for a dismissal under section 2-615 is *de novo*. *Powell*, 2014 IL App (1st) 123643, ¶ 13.

¶ 59    A section 2-619 motion to dismiss admits the legal sufficiency of the complaint but asserts certain defects or defenses outside the pleadings which defeat the claims. See *Porter v. Decatur Memorial Hospital*, 227 Ill. 2d 343, 352 (2008). The section 2-619 motion admits as true all well-pleaded facts, all reasonable inferences to be drawn from the facts, and the legal sufficiency of the claim. *Id.* In addition, all pleadings and supporting documents must be construed in the light most favorable to the non-moving party. *Id.* When ruling on a section 2-619 motion to dismiss, the court may consider pleadings, depositions, and affidavits; facts contained in supporting affidavits that are not challenged by counter-affidavits are deemed to be true. *Goral v. Kulys*, 2014 IL App (1st) 133236, ¶ 30. At issue on appeal is the question of " 'whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law.' " *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55 (quoting *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17 (1993)). The dismissal of a section 2-619 motion to dismiss is reviewed *de novo. Porter*, 227 Ill. 2d at 352.

¶ 60                                2. *Motion to Reconsider*

¶ 61    In their combined motion following the circuit court's denial of this motion to dismiss, Defendants sought (2) reconsideration of that denial or, in the alternative, (3) dismissal based on the Act.

¶ 62    The purpose of a motion to reconsider is to bring to a court's attention (1) newly discovered evidence, (2) changes in the law, or (3) errors in the court's previous application of existing law. *River Plaza Homeowner's Ass'n v. Healey*, 389 Ill. App. 3d 268, 280 (2009). It is not proper to use a motion to reconsider to raise a new legal theory or factual argument that was available prior to the hearing on the motion from which the motion to reconsider arises. *Id.* We use an abuse of discretion standard for reviewing a trial court's denial of a motion to reconsider that is based on

new matters, including additional facts or new legal theories that were not presented during the prior course of proceedings. *Muhammad v. Muhammad-Rahmah*, 363 Ill. App. 3d 407, 415 (2006). When the denial is based only on the trial court's application of existing law, the standard is *de novo*. *Id.* Here, the Sun-Times's motion was based on a misapplication of the law, and we review the court's denial of the motion to reconsider under the *de novo* standard.

¶ 63                    3. *Dismissal Pursuant to the Act*

¶ 64    A motion to dismiss a suit as a SLAPP under the Act is raised as a motion pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2020)), which seeks dismissal where the claim is " 'barred by other affirmative matter avoiding the legal effect of or defeating the claim.' " *Sandholm*, 2012 IL 111443 ¶ 54; see also *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003) (Immunity from tort liability pursuant to statute is an affirmative matter properly raised in a section 2-619 motion to dismiss.) The question of whether the suit should have been dismissed pursuant to the Act is a question of statutory construction; as such, we review the circuit court's interpretation of the statute *de novo*. *Sandholm*, 2012 IL 111443, ¶ 41; *Goral*, 2014 IL App (1st) 133236 ¶ 31.

¶ 65                    B. Sun-Times's Section 2-619.1 Motion to Dismiss

¶ 66    In its initial section 2-619.1 motion to dismiss, the Sun-Times argued that Glorioso's counts of defamation *per quod* and *per se*, as well as the related false light invasion of privacy counts, should be dismissed pursuant to section 2-615 because the articles are substantially true and because Glorioso failed to plead actual malice or, on the counts of defamation *per quod*, special damages.

¶ 67                    1. *Substantial Truth*

¶ 68    In all of the motions on appeal, the Sun-Times argues that its statements are substantially true. A defendant who asserts that his statements were substantially true bears the burden of showing that the "gist" or "sting" of the allegedly defamatory content is true. *Ryan v. Fox Television Stations, Inc.*, 2012 IL App (1st) 120005, ¶ 28 (citing *Gist v. Macon County Sheriff's Department*, 284 Ill. App. 3d 367, 371 (1996)). When determining the "gist" or "sting" of the allegedly defamatory statements, the trial court must " 'look at the highlight of the article, the pertinent angle of it, and not to items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement.' " *Gist*, 284 Ill. App. 3d at 371 (quoting *Vachet v. Central Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987)). A statement need not be "technically accurate in every detail" in order to be substantially true and nonactionable as defamatory content. *Id.* While substantial truth is normally a question of fact for the jury, it may properly be decided as a matter of law if no reasonable jury could find that the statements were not substantially true. This court reviews such a decision *de novo*. *Id.*

¶ 69    The Sun-Times argues that the articles do not deviate from fairly and accurately describing the accusations made in the OEIG complaint—namely, that Glorioso told Waggoner that he wanted a reduction in the Trump Tower appeal because the property owner was the president, Waggoner complied with Glorioso's directive, Glorioso's ALJs followed his orders, and Glorioso's staff and Waggoner authored a revised report granting the reduction. It claims that the circuit court erred in finding that the reporting created an implication that Glorioso played a greater role in the alleged scheme than what was actually written in the OEIG complaint and the "gist" or "sting" of the statements actually softened the accusations of the whistleblower against Glorioso by offering potentially legitimate reasons for replacing the original ALJ decision and granting the appeal, including the vacant storefronts at Trump Tower.

¶ 70    The key factor upon which the court based both of its denials of the Sun-Times's substantial truth and fair report arguments is the articles' focus on Glorioso, specifically, as the predominant player in the alleged scheme to grant the Trump Tower property tax appeal for politically motivated reasons. The court recognized that the articles did not need to be accurate in every single detail but noted that the reporting must be fair and could not create an erroneous impression to readers or add the comments or insinuations of the reporter. See *Kurczaba v. Pollock*, 318 Ill. App. 3d 686, 707-08 (2000).

¶ 71    We agree with the circuit court that the articles' description of the alleged scheme and the investigation rose above being merely "not technically accurate in every detail" to containing a series of omissions and/or misplaced statements that rendered the reporting an unfair summary of events that downplayed the involvement of anyone besides Glorioso. The articles not only repeatedly mention Glorioso by name, despite the inclusion of four other individuals in the OEIG Complaint, but also focus on him in how they frame the reporting on the investigation, including but not limited to the use of his name in headlines and of his photo alongside the reporting. It is true that Glorioso was, at the time of the reporting, the executive director and general counsel of PTAB. However, he did not have the same degree of authority during the alleged events in the OEIG Complaint, and it could be argued that Waggoner's role, as chief ALJ, held more authority for directing a result on a property tax appeal. We note that there is a basis for the circuit court's finding that a reasonable reader could believe that Glorioso held more authority, and therefore bears greater culpability, than he actually did. The gist or sting of these articles could validly be read as implying that Glorioso had a great deal of authority over the ALJs, beyond what his position at PTAB at the time actually entailed. The circuit court properly found a number of questions of fact for the jury to decide.

¶ 72    As noted above, a reasonable reading of the articles could leave a reader believing that Glorioso forced the ALJs to act according to his wishes, which goes beyond the accusations against Glorioso in the OEIG complaint. The circuit court also commented that the October articles in particular implied that Glorioso was fired for his involvement in the alleged scheme, which the record shows was not the case. We find that the circuit court's proposed interpretation of the articles is one that a finder of fact could reasonably draw from the gist or sting of the Sun-Times's statements. At this stage of the litigation, the question of substantial truth is a question of fact, which should be determined by the jury. *Harrison v. Chicago Sun-Times, Inc.*, 341 Ill. App. 3d 555, 563 (2003).

¶ 73                                      2. *Actual Malice*

¶ 74    Regarding actual malice, Sun-Times argued that, as a public official, Glorioso was required to plead with clear and convincing evidence that the defendants acted with actual malice in publishing its statements, meaning that they knew the statements were false or made them with a reckless disregard for the truth. See *Kessler v. Zekman*, 250 Ill. App. 3d 172, 187-88 (1993).

¶ 75    The circuit court referred to the same reasoning it stated as to why the Sun-Times's substantial truth and fair report privilege arguments failed and held that Glorioso sufficiently pled actual malice and the question of whether the defendants acted with actual malice remained a factual question that should survive the pleading stage.

¶ 76                                      3. *Special Damages*

¶ 77    Finally, the circuit court found that Glorioso sufficiently pled special damages in his defamation *per quod* counts by stating that he suffered the loss of his employment as a direct consequence of the publication of the articles. See *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 104 (1996) (To plead defamation *per quod*, plaintiff must plead with particularity actual

pecuniary damages resulting from the defamatory statement.) The Sun-Times argued that Glorioso could not show that the governor made the decision to fire him after reading the articles. The circuit court rejected this argument, stating that, at the pleading stage, Glorioso did not need to prove his claims and that his pleading of the loss of his employment sufficed.

¶ 78                                    4. *Fair Report Privilege*

¶ 79    The Sun-Times also argued, pursuant to section 2-619, that the suit should be dismissed because the Novak declaration and related exhibits supported a defense under the fair report privilege.

¶ 80    The fair report privilege requires two conditions to be met: (1) the report must be of an official proceeding and (2) the report must be complete and accurate or a fair abridgement of the official proceeding. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 588 (2006) (discussing Restatement (Second) of Torts § 611 cmt. *a*, *b* (1977).) In order for the privilege to apply, the report need not be accurate in every single detail, but it cannot omit or misplace any information in a way that creates an erroneous impression to readers, report on events unfairly and inaccurately, or add the comments or insinuations of the reporter. See Restatement (Second) of Torts § 611 cmt. *f* (1977); *Kurczaba*, 318 Ill. App. 3d at 707-08 ("The privilege can be lost if the report is inaccurate or unfair, where the 'account is discolored or garbled,' or where comments or insinuations are added.")

¶ 81    The parties do not dispute whether the subject matter of the articles involves official proceedings, and the second factor of the fair report analysis folds into the discussion of whether the gist or sting of the Sun-Times's statements constitute fair and accurate reporting on the Trump Tower appeal and the OEIG Investigation. The court restated its reasoning for determining that the articles could reasonably be read as substantially true, and we similarly affirm its decision here.

¶ 82                                    C. Motion for Reconsideration

¶ 83     In its motion for reconsideration, the Sun-Times argues that the circuit court failed to apply the rigorous standard required for reviewing defamation cases in its analysis of the Sun-Times's arguments as to falsity, actual malice, and special damages. Its arguments are substantially the same as those discussed above, regarding its initial motion to dismiss. Without making any finding the merits of the defamation claims, we agree with the circuit court's dismissal of the Sun-Times's motion to dismiss and denial of reconsideration of its decision.

¶ 84     We agree with the circuit court's rejection of the Sun-Times's second attempt at invoking the defenses of substantial truth and the fair report privilege, Sun-Times's repeated assertion that Glorioso failed to plead actual malice, and the Sun-Times's argument that the circuit court improperly engaged in speculation regarding the pleading of special damages. We find that the record supports the circuit court's denial of the original motion to dismiss, thereby allowing Glorioso's complaint to survive the pleading stage on the defamation *per quod*, defamation *per se*, and false light invasions of privacy. We affirm its denial of the motion to reconsider.

¶ 85                    D. Section 2-619 Motion to Dismiss Pursuant to the Act

¶ 86     The second portion of the Sun-Times's combined motion presents a section 2-619 motion to dismiss that raised for the first time an argument under the Act. The legislature enacted the Act to combat the rise of meritless lawsuits used to retaliate against the defendants' attempt to participate in government through exercising their first amendment rights. *Ryan*, 2012 IL App (1st) 120005 ¶ 12; *Sandholm*, 2012 IL 111443, ¶¶ 33-34. In the Act, the guiding public policy is articulated as an interest in "strik[ing] a balance between the rights of persons to file lawsuits for

injury and the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government" and "protect[ing] and encourag[ing] public participation in government to the maximum extent permitted by law." 735 ILCS 110/5 (West 2020). The Act provides a defense against such "Strategic Lawsuits Against Public Participation," or SLAPPs, where a defendant engages in " '[a]cts in furtherance of the constitutional rights to petition, speech, association, and participation in government \*\*\*, regardless of intent or purpose, except when not genuinely aimed at procuring favorable government action, result, or outcome.' " *Goral¸* 2014 IL App (1st) 133236 ¶ 32 (quoting 735 ILCS 110/15 (West 2010)). The legislature intended that the Act "shall be construed liberally to effectuate its purposes and intent fully." 735 ILCS 110/30(b) (West 2020). In deciding whether a lawsuit should be dismissed pursuant to the Act, a court must first determine whether the suit is the type of suit the Act was intended to address. *Sandholm*, 2012 IL 111443, ¶ 43.

¶ 87 The circuit court, after noting that the Sun-Times should have raised this argument in its initial section 2-619.1 motion to dismiss, determined that defendants had failed to meet their burden of showing that the suit should be dismissed as a SLAPP. We agree with the circuit court.

¶ 88                                        1. *SLAPP Elements and Analysis*

¶ 89 In *Sandholm*, our supreme court limited the Act's application to SLAPPs, which it defined as lawsuits "*solely* based on, relating to, or in response to 'any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government.' " (Emphasis in original.) *Sandholm*, 2012 IL 111443, ¶ 45 (quoting 735 ILCS 110/15 (West 2008)); see also *Goral*, 2014 IL App (1st) 133236 ¶ 33. If the plaintiff genuinely seeks "relief for damages for the alleged defamation or intentionally tortious acts of defendants," it is not a SLAPP and not subject to dismissal under the Act. *Sandholm*, 2012 IL 111443, ¶ 45.

¶ 90   A court considers three factors in determining whether a suit is subject to dismissal under the Act: (1) whether the defendants' acts were " 'in furtherance of their right to petition, speak, associate, or otherwise participate in government to obtain favorable government action' "; (2) whether the plaintiff's claims are solely based on the aforementioned acts; and (3) whether the plaintiff has shown by clear and convincing evidence that " 'the defendants' acts were not genuinely aimed at solely procuring favorable government action.' " *Goral*, 2014 IL App (1st) 133236, ¶ 34 (quoting *Hammons v. Society of Permanent Cosmetic Professionals*, 2012 IL App (1st) 102644, ¶ 18.) The defendants bear the burden of proving the first two factors in the affirmative, after which the burden shifts to the plaintiff to establish the third factor. *Id.* (citing *Garrido v. Arena*, 2013 IL App (1st) 120466, ¶ 16.) The second factor has been further broken down into two prongs, requiring the defendants to show that the suit was both meritless and retaliatory. *Id.* ¶ 38.

¶ 91                    a. *Whether Defendants' Reporting Was Solely in*

*Furtherance of Government Participation*

¶ 92   The first factor the court considers in analyzing whether a lawsuit is a SLAPP is whether the actions alleged in the complaint are of the kind protected by the Act. This is the most straightforward prong. See *Garrido*, 2013 IL App (1st) 120466, ¶ 17. However, the parties here dispute whether the Sun-Times's articles constitute acts in furtherance of government participation, seeking to procure favorable government action. Both sides draw comparisons to the facts in *Goral* in arguing whether the Sun-Times's reporting on Glorioso was in furtherance of a right to speak on and participate in government. In that case, the defendant was a blogger who wrote articles questioning a former political candidate's eligibility and qualifications in her run for aldermanic office. *Goral*, 2014 IL App (1st) 133236, ¶¶ 3-4. The plaintiff conceded that the first

prong had been met, and we did not find otherwise. *Id.* ¶ 36; see also *Garrido*, 2013 IL App (1st) 120466, ¶¶ 5-6, 17 (Defendant's ads and mailers, accusing a political candidate of corrupt behavior—of receiving money from a controversial parking meter privatization deal and of standing to draw two city pensions—were protected speech under the Act.)

¶ 93                                    i. *Sun-Times's Argument*

¶ 94     The Sun-Times equates its critical articles about Glorioso to the critical comments made in the blog posts in *Goral*, which we found to be protected political speech that would have been aimed at procuring favorable government action, even if the action sought was to encourage the electorate not to elect the plaintiff. *Goral*, 2014 IL App (1st) 133236, ¶ 63.

¶ 95     The Sun-Times also relies on *Ryan*. In *Ryan*, we found that it was "indisputable" that the defendants' investigatory reporting fell within protected activity under the Act. *Ryan*, 2012 IL App (1st) 120005, ¶ 19. In that case, the defendants aired a four-part investigative series accusing several Cook County circuit court judges, including the plaintiff, of leaving work early and generally shirking their judicial duties. *Id.* ¶¶ 2-8. The Sun-Times compares its reporting on an official investigation into the acts of PTAB executive director and general counsel Glorioso and administrative law judges like Waggoner to the reporting on the behavior of judges in *Ryan*.

¶ 96                                    ii. *Glorioso's Argument*

¶ 97     Glorioso distinguishes both cases, arguing that the statements at issue in *Goral* merely questioned the plaintiff's eligibility and qualifications. It is true that we found in *Goral* that the defendant's statements were reasonably capable of an innocent construction because they were conditioned on the existence of other facts and did not actually accuse the plaintiff of committing a crime, thus holding that his statements were not defamatory *per se*. *Goral*, 2014 IL App (1st) 133236, ¶ 48. However, here, that is in question due to Glorioso's argument, with which the circuit

court agreed, that defendants' statements could be reasonably construed as going beyond any innocent reporting on the investigation to defaming Glorioso because the articles are written around him, specifically, rather than about the investigation more broadly.

¶ 98    Glorioso next distinguishes *Ryan* on the basis that, in that case, we held that the reports communicated the findings of the investigation to the public and to the local government and sought comment and action from the Illinois Supreme Court and the chief judge of the circuit court. *Ryan*, 2012 IL App (1st) 120005, ¶ 19. We further quoted from the Act's public policy statement to note that it was the legislature's position that " '[t]he information, reports, opinions, claims, arguments, and other expressions provided by citizens are vital to effective law enforcement, the operation of government, *** and the continuation of representative democracy.' " *Id.* (quoting 735 ILCS 110/5 (West 2010)).

¶ 99                              iii. *Circuit Court's Findings*

¶ 100   The circuit court did not substantively address this prong in its decision. However, we note that it previously found, in its May 25, 2021, order on the Sun-Times's section 2-619.1 motion to dismiss, that the misrepresentations about the investigation and about Glorioso's actions, intentions, and authority—all presented as news rather than opinion—prevented the court from accepting the Sun-Times's substantial truth and fair report defenses. This is relevant to the discussion of whether defendants have established the first prong of the SLAPP analysis as well.

¶ 101                                   iv. *Analysis*

¶ 102   There is support in *Ryan* for the premise that reporting on the actions of a government agency in order to inform the voting public has value in maintaining a functioning democracy and operational government. However, the present matter is distinguishable, given the existence of a genuine question of fact as to whether the articles solely alert the public to the investigation into

PTAB. The articles were published as news articles—factual reporting on the events of the investigation, the alleged PTAB scheme, and Glorioso's firing—as they occurred, rather than editorial or opinion pieces that present the thoughts and stance of the writer. While news reporting could include the goal of favorable government action, as we found in *Ryan*, the facts of this case do not unquestionably lead us to the same finding. There is, for example, no way for voters to remove Glorioso, since he was already fired and the head of PTAB is not an elected position. The articles do not seek comment from the governor's office or any other government body on the matters in the reporting. We cannot conclude that the Sun-Times has sufficiently established that the articles were solely in furtherance of their right to participate in government to obtain favorable government action.

¶ 103        b. *Whether Glorioso's Claims Are Solely Based on Sun-Times's Protected Speech*

¶ 104   Turning to the second prong, we must establish whether the Sun-Times has met its burden of showing that Glorioso's suit was solely based on their exercise of political rights. *Goral*, 2014 IL App (1st) 133236, ¶ 38. In order to do so, defendants must show that the suit was " 'meritless and was filed in retaliation against the [defendants'] protected activities in order to deter the [defendants] from further engaging in those activities.' " *Garrido*, 2013 IL App (1st) 120466, ¶ 18 (quoting *Ryan*, 2012 IL App (1st) 120005, ¶ 21).

¶ 105   As our supreme court explained in *Sandholm*, where it originated the "meritless and retaliatory" standard, SLAPPS are by definition meritless, as the plaintiffs' goal is to chill the defendants' speech and "discourage opposition by others through delay, expense, and distraction." *Sandholm*, 2012 IL 111443, ¶ 34. In *Garrido*, we articulated how to determine whether a suit is meritless or not, stating that a claim is not meritless if, for example, it was subject to dismissal under section 2-615, as immunity based on the Act is an affirmative defense that is properly

brought under a section 2-619 motion to dismiss. *Garrido*, 2013 IL App (1st) 120466, ¶ 19; see also *Ryan*, 2012 IL App (1st) 120005, ¶ 26 (rejecting defendants' argument that the claims were meritless because plaintiff failed to sufficiently plead a cause of action under the standard of section 2-615); *Hammons*, 2012 IL App (1st) 102644, ¶ 21. However, a suit *is* meritless if the defendant can disprove some element of the plaintiff's claim. *Garrido*, 2013 IL App (1st) 120466, ¶ 19; see also *Wright Development Group, LLC v. Walsh*, 238 Ill. 2d 620, 638 (2010) (Plaintiff's defamation claim was meritless because defendant showed that allegedly defamatory statement was actually true.) We further explained that a SLAPP does not seek to make the plaintiff whole but, rather, only serves to punish or deter the defendant's legitimate exercise of first amendment rights. *Garrido*, 2013 IL App (1st) 120466, ¶ 20. Because we cannot determine whether a lawsuit is a SLAPP based solely on the pleadings, we must accept all well-pled facts as true and analyze whether the Sun-Times has affirmatively disproven some essential element of Glorioso's complaint, which they attempt to do by arguing that the articles only contain statements that are substantially true and fair reporting or figurative speech that is nonactionable as defamatory content. See *id.* ¶ 23.

¶ 106                  i. *Whether Sun-Times Has Established the Suit Is Meritless*

¶ 107   The Sun-Times challenges all of the counts of Glorioso's complaint by arguing that (1) the articles were substantially true, (2) an innocent construction of the articles precludes judgment, (3) the articles are privileged as fair reports, and (4) the claims failed to plead special damages with particularity.[3] The circuit court relied on its prior denial of the Sun-Times's first motion to dismiss, based on the same arguments but not invoking the Act, as well as its findings that Novak, through a combination of omissions (of mentions in the OEIG Complaint of others' alleged

---

[3]We address the special damages argument in section B(3), regarding Sun-Times' initial section 2-619.1 motion to dismiss.

involvement in the scheme to reduce the property tax assessment) and additions (of statements assuming Glorioso's personal involvement and culpability) left it a question of fact whether the articles were substantially true, or whether they overstated Glorioso's role and motivations in the alleged scheme beyond the actual allegations made by the whistleblower.

¶ 108   For the reasons previously explained in section B(1) and (4), we agree with the circuit court that the Sun-Times's reporting could reasonably be read as not fair, accurate, or truthful by creating the implication that Glorioso was more culpable in the alleged scheme than the OEIG Complaint claimed, both in terms of his supposed actions and his supposed authority over PTAB employees.

¶ 109   We find that the record supports the circuit court's proffered defamatory reading of the articles as a reasonable one, that allows Glorioso's complaint to survive the pleading stage. Defendants have failed to meet their burden of proving that his lawsuit was meritless.

¶ 110   However, we take no position on the merits of the defamation claims or the Sun-Times's defenses; we limit our decision to affirming the circuit court's determination that these issues should have been presented to the jury.

¶ 111        ii. *Whether the Sun-Times Has Established the Suit Is Retaliatory*

¶ 112   The next question is whether Glorioso's lawsuit was filed with the goal of seeking damages for the harm that the Sun-Times's articles caused to Glorioso's reputation and character, or whether it was "solely based on, related to, or in response to the acts of defendants in furtherance of the rights of petition and speech," intended to chill the Sun-Times's "participation in government or to stifle political expression." See *Sandholm*, 2012 IL 111443, ¶ 57. The courts look to two factors to conduct this analysis: "(1) the proximity in time between the protected activity and the filing of the complaint, and (2) whether the damages requested are reasonably related to the facts alleged in the complaint and are a 'good-faith estimate of the extent of the injury sustained.' " *Ryan*, 2012

IL App (1st) 120005, ¶ 23 (quoting *Hytel Group, Inc. v. Butler*, 405 Ill. App. 3d 113, 126 (2010)). These factors are not exclusive "and there may well be other factors that are relevant." *Id.* It is the defendants' burden to show that the lawsuit was retaliatory. *Sandholm*, 2012 IL 111443, ¶ 57.

¶ 113   Regarding the timing of the lawsuit, Glorioso sued for defamation approximately 11 months after the publication of the first of the Sun-Times articles at issue. Glorioso argues that the length of time between publication and his suit supports a finding that the suit was not retaliatory, as it did not stifle the defendants' rights to petition, to speak, or to participate in government. See *Ryan*, 2012 IL App (1st) 120005, ¶ 23 (plaintiff filed complaint less than three days after the first segment of defendant's reporting aired; proximity in time was "not necessarily dispositive evidence of retaliatory intent," but was "a probative fact" made more plausible by the fact that plaintiff filed suit before the last segment aired). It is true that waiting until shortly before the running of the statute of limitations on the first set of articles does not indicate an attempt to silence the Sun-Times's future reporting on Glorioso or PTAB. The approximately three months between the lawsuit and the October articles also does not suggest retaliation. Similarly, unlike instances where plaintiffs attempted to sue for punitively and disproportionally large sums of money, Glorioso seeks $50,000; regardless of his intentions in suing, this does not provide evidence that the lawsuit was retaliatory. See *id.* ¶ 24 (damages of $7 million in addition to punitive damages suggested retaliation; "[d]emanding damages in the millions for alleged defamation is a classic SLAPP scenario"); see also *Hytel*, 405 Ill. App. 3d at 126 (evidence of retaliation where extraordinarily high damages sought were not supported by the facts pled) We agree with the circuit court that the timing and amount of damages sought does not indicate retaliatory behavior. However, these are not the only factors to consider, as we may also look to other relevant matters

specific to the facts of this case. We will address the other points raised in Defendants' petition below.

¶ 114   The Sun-Times points to the emails it received through a FOIA request to PTAB that reveal that Glorioso was aware of the allegations of the OEIG complaint prior to filing his defamation suit, and, more notably, he acknowledged that the complaint accused him of having directed a particular result in the Trump Tower appeal based on his political bias rather than the merits of the appeal. In his complaint against the Sun-Times and Novak, he takes issue with the articles' characterization of the OEIG Complaint allegations as accusing him of precisely that. We emphasize again that the defamation suit is not based on the existence of an investigation, which Glorioso concedes. Rather, he argues that the portrayal of the investigation unfairly centers on and inflates his actions and malintent. Furthermore, if he discussed the allegations against him, none of the emails the Sun-Times obtained amount to an admission to the whistleblower's claims. Therefore, Glorioso's knowledge of the complaint's allegations does not indicate that his suit was retaliatory.

¶ 115   In determining whether the defendants have sufficiently shown that a purported SLAPP was retaliatory, the court applies the Act on a case-by-case basis. See *Hytel*, 405 Ill. App. 3d at 126. Considering the timing of the lawsuit and the amount of damages sought, as well as other factors raised by Defendants, we cannot conclude that Defendants have met their burden of proving that Glorioso's defamation suit was retaliatory in nature.

¶ 116                               2. *SLAPP Determination*

¶ 117   Sun-Times has not established that its articles were solely in furtherance of their right to participate in government to obtain favorable government action. Furthermore, there is sufficient evidence that a reasonable finder of fact could read the Sun-Times's articles and determine that

they do not constitute fair, accurate, and truthful reporting, for the reasons articulated by the circuit court. We find that the Sun-Times has not sufficiently established that Glorioso's suit was meritless. Finally, the Sun-Times has failed to meet their burden of showing that the suit was retaliatory, based on the facts and circumstances in this matter, including the timing of the suit and amount of damages sought.

¶ 118   We affirm the circuit court's order denying the motion to dismiss on the basis of the Act and find that the plaintiff's lawsuit is not a SLAPP under the Act.

¶ 119                                IV. CONCLUSION

¶ 120   For the reasons stated above, we affirm the judgment of the circuit court, denying the defendants' motion to dismiss pursuant to section 2-619.1 and their motion to reconsider that dismissal or, in the alternative, to dismiss pursuant to section 2-619 and the Act, finding that this lawsuit is not a SLAPP.

¶ 121   Affirmed and remanded.

*Glorioso v. Sun-Times Media Holdings, LLC*, **2023 IL App (1st) 211526**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2021-L-00090; the Hon. Patricia O'Brien Sheahan, Judge, presiding. |
| **Attorneys for Appellant:** | Damon E. Dunn and Seth A. Stern, of Funkhouser Vegosen Liebman & Dunn Ltd., of Chicago, for appellants. |
| **Attorneys for Appellee:** | Phillip J. Zisook and William R. Klein, of Schoenberg Finkel Beederman Bell Glazer, LLC, of Chicago, for appellee. |