**2024 IL 130137**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 130137)

MAURO GLORIOSO, Appellee, v. SUN-TIMES MEDIA
HOLDINGS, LLC, *et al.*, Appellants.

*Opinion filed November 21, 2024.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Holder White, Cunningham, and O'Brien concurred in the judgment and opinion.

Justice Rochford took no part in the decision.

**OPINION**

¶ 1    Defendants, Sun-Times Media Holdings, LLC, and Tim Novak, appeal the judgment of the appellate court, which affirmed an order of the circuit court of Cook County that denied their second motion to dismiss the defamation complaint filed by plaintiff, Mauro Glorioso. On appeal, defendants contend the complaint is

subject to dismissal as a "Strategic Lawsuit Against Public Participation (SLAPP)" pursuant to section 15 of the Citizen Participation Act (Act). 735 ILCS 110/15 (West 2022). For the following reasons, we find the lawsuit is not a SLAPP and affirm.

¶ 2                                 I. BACKGROUND

¶ 3                            A. Plaintiff's Complaint

¶ 4      The following facts are derived from plaintiff's complaint, which he filed on January 5, 2021. Plaintiff is an Illinois attorney who was employed by the Property Tax Appeal Board (PTAB) from December 2000 through October 2020. After working as an administrative law judge (ALJ) for eight years, he was appointed as a PTAB commissioner and, in 2016, as chairman of PTAB, where he served until March 2019. At that time, Governor Pritzker appointed him executive director and general counsel of PTAB.

¶ 5      On February 7, 2020, defendant published through the *Chicago Sun-Times* website an article captioned "President's Chicago tax appeal on Trump Tower is under investigation" (February 7 article) (Tim Novak, *President's Chicago Tax Appeal on Trump Tower Is Under Investigation*, Chi. Sun-Times, Feb. 7, 2000, https://chicago.suntimes.com/2020/2/7/21126855/donald-trump-tower-chicago-property-tax-appeal-investigation [https://perma.cc/5VEN-YCLQ]). The subheading of the February 7 article read "State inspector general, Pritzker administration looking into allegation a Republican state agency head pressured staff to slash by $1M the $2.5M in property taxes Donald Trump paid in 2012." *Id.* According to the complaint, the article falsely identified plaintiff as being under investigation for pressuring PTAB staff to grant a real estate reduction in excess of $1 million on the property known as Trump Tower, based upon political loyalty, rather than the merits of the case. In addition, the complaint alleges the February 7 article falsely stated that plaintiff did this to "cut the President a break" and that he "rejected PTAB staff's decision to deny Trump any award" as a consequence of plaintiff's "political motivations," which were "improperly driving the decision-making."

¶ 6    On Sunday, February 9, 2020, defendant republished a print version of the February 7 article (February 9 article) in the *Chicago Sun-Times* newspaper. See Tim Novak, *Prez's Tax Appeal on Chicago Tower Under Investigation*, Chi. Sun-Times, Feb. 9, 2000, at 4. On the front page of that edition, defendant published a large color photograph of Trump Tower, with a superimposed photograph of President Donald Trump waving, and in large, block letters printed "PROBING PREZ'S CHICAGO TOWER TAX APPEAL." *Id.* at 1. Underneath that caption was the subheading "Two investigations looking into allegation that a Republican state agency head pressured staff to slash property taxes Trump paid in 2012." *Id.* The front page directed readers to the inside pages of the newspaper, which reprinted the substance of the February 7 article, along with a new headline in large, block print that read "PREZ'S TAX APPEAL ON CHICAGO TOWER UNDER INVESTIGATION," followed by the subheading "State inspector, Pritzker administration looking into allegation a Republican state agency head pressured staff to slash $2.5M property taxes Trump paid in 2012 to $1M." *Id.* at 4. The article also included a color photograph of plaintiff.

¶ 7    On October 9, 2020, defendant published another article (October 9 article), which was captioned "Pritzker dumps official who pushed for Trump to get $1 million refund on Chicago tower's taxes." See Tim Novak, *Pritzker Dumps Official Who Pushed for Trump to Get $1 Million Refund on Chicago Tower's Taxes*, Chi. Sun-Times (Oct. 9, 2020), https://chicago.suntimes.com/2020/10/9/21509933/ trump-tower-chicago-property-tax-dispute-pritzker-mauro-glorioso-illinois-property-tax-appeal-board [https://perma.cc/MSV5-UZ3M]. The October 9 article included the subheading "[Plaintiff], a Westchester Republican the governor appointed to head the [PTAB] is under a state investigation over his Trump Tower recommendation." *Id.* The complaint alleges the article falsely identified plaintiff as having "pushed" or "pressured" a refund for Trump based on political motivations, rather than the merits of the appeal. The October 9 article further stated, "[t]he 64-year-old Westchester resident and staunch Republican rejected a report from hearing officer Simeon Nockov, who found that Trump didn't merit a refund because Burke's law firm didn't present sufficient evidence to support one." *Id.* The complaint alleges the October 9 article also falsely stated that "[a]ny tax refund for Trump would come out of property taxes to the city of Chicago and eight other government agencies, the Chicago Public Schools losing the biggest chunk of money: more than $540,000 if the president gets what [plaintiff] wants." *Id.*

¶ 8        On Sunday, October 11, 2020, defendant republished a print version of the October 9 article (October 11 article). On the front page of the *Chicago Sun-Times* newspaper of that date was a large, color photograph of Trump Tower and, in block letters, a caption reading "GOV AXES OFFICIAL WHO PUSHED FOR $1M TAX REFUND ON TRUMP TOWER." Tim Novak, *Gov Axes Official Who Pushed for $1m Tax Refund on Trump Tower*, Chi. Sun-Times, Oct. 11, 2020, at 1. Underneath the caption was a color photograph of plaintiff and the subheading, "[Plaintiff], a Westchester Republican who Pritzker appointed to head the [PTAB], is under state investigation over his recommendation." *Id.* The front-page introduction then directed readers to a reprint of the October 9 article, which was modified to include the headline "PRITZKER DUMPS OFFICIAL WHO PUSHED FOR TRUMP TO GET $1M REFUND ON TOWER'S TAXES." *Id.* at 18. The complaint alleges, on information and belief, that the articles were circulated in print form to more than 120,000 people each and generally circulated by defendant on the Internet.

¶ 9        Counts I and II of the complaint allege a cause of action for defamation *per quod* based on the publication of the February 7 and February 9 articles respectively. In support, these counts allege there had been a confidential, anonymous complaint filed with the Office of the Executive Inspector General (OEIG) regarding the Trump Tower PTAB appeal. Plaintiff alleges that, although defendants acknowledged having reviewed this report, the February articles dramatically distorted the substance of that report. Specifically, he alleges that, contrary to the statements published therein, there were no statements in the anonymous complaint that plaintiff (i) "pressured his staff to cut the president a break," (ii) "pressured his staff to rule in the president's favor," or (iii) "rejected the [PTAB] staff's decision to deny Trump any refund." Further, the complaint alleges there was no allegation in the anonymous complaint that plaintiff directed that a legal decision on the Trump Tower property tax appeal be driven by political motivations rather than the merits of the case. Count I alleges the February articles do not constitute fair reports of the anonymous complaint and falsely depict plaintiff as a corrupt political official lacking integrity in his occupation and profession.

¶ 10       Counts I and II allege that statements published in the February articles were false in that he never directed PTAB's initial decision in the Trump Tower PTAB

appeal be rejected and never directed that a PTAB decision finding in favor of Trump Tower and refunding more than $1 million be substituted in its place. He alleges he never directed a decision in any PTAB case be determined on the basis of political affiliation rather than the merits of the case and that such conduct on his part was not charged in the anonymous complaint.

¶ 11    Counts III and IV allege causes of action based on defamation *per se* based on the October 9 article and the October 11 article, respectively. These counts allege that defendant used plaintiff's anticipated termination as PTAB executive director and general counsel in October 2020 as a basis to publish further false statements concerning the anonymous complaint. According to these counts, the October articles falsely reported that the anonymous complaint alleged plaintiff ordered PTAB to approve the $1 million payout for Trump, rejecting a staff report that found no valid reason to support the refund on Trump Tower. These counts allege defendant knew plaintiff was without authority to order such action by PTAB, as he was a commissioner at the time of the anonymous complaint's allegations and not executive director. Finally, these counts allege the October articles correlated plaintiff's actions with jeopardizing funding for Chicago public schools, a correlation that is false and without foundation.

¶ 12    Counts I though IV (the defamation counts) alleged that the statements made in the February articles and the October articles did not constitute a fair report of the contents of the anonymous complaint and were made with actual malice because defendant knew they were false or acted with reckless disregard of their falsity, as defendants were in possession of the anonymous complaint.

¶ 13    Counts V, VI, VII, and VIII allege causes of action for false light invasion of privacy based on each of the February and October articles respectively. These counts allege the articles placed plaintiff in a false light before the public, which would be highly offensive to a reasonable person, because they falsely accused him of conduct showing a lack of integrity as executive director and general counsel of PTAB. Finally, Count X alleges a cause of action for intentional infliction of emotional distress. All counts allege that, as a result of defendants' conduct, plaintiff sustained humiliation, anxiety, embarrassment, mental anguish, injury to his reputation, termination of his position as executive director and general counsel of PTAB, and resulting monetary damages, including lost salary, lost benefits, and

medical expenses. The February and October articles were attached to the complaint as exhibits.

¶ 14                          B. Defendants' First Motion to Dismiss

¶ 15        On March 5, 2021, defendants filed a combined motion to dismiss plaintiff's complaint pursuant to section 2-619.1 of the Code of Civil Procedure (Code). 735 ILCS 5/2-619.1 (West 2020). Defendants' motion to dismiss based on section 2-615 of the Code (*id.* § 2-615) argued that all counts of the complaint should be dismissed because plaintiff's allegations of falsity are belied by his acknowledgment that he was investigated and removed and, thus, are true or substantially true and that the words he complains of are figurative and conditional in context. In addition, they argued that reporting news of an inquiry into unproven allegations precludes a conclusion that defendants acted with "actual malice" as a matter of law. The section 2-615 motion to dismiss also argued that specific counts should be dismissed for failure to allege special damages with particularity, because certain statements are reasonably capable of innocent construction and the intentional infliction of emotional distress count failed to adequately allege outrageous conduct.

¶ 16        For their motion to dismiss pursuant to section 2-619 of the Code (*id.* § 2-619), defendants argued that they were immunized from liability for publishing the February articles and October articles by the fair report privilege. In addition, they argued that plaintiff's failure to append the anonymous complaint made to the OEIG to his complaint defeated his cause of action, because that document would prove his claims have no merit. Finally, defendants argued that the anonymous complaint extinguished all inferences that defendants made the publications with actual malice. In support of their motion, defendants attached the "Declaration of Timothy Novak," which avers as follows.

¶ 17                          1. Declaration of Timothy Novak

¶ 18        Mr. Novak has been an investigative reporter since 2000 focusing on exposing corruption in the state of Illinois, receiving multiple local and national awards for his reporting. He is familiar with the Trump Tower appeal pending before PTAB,

having attended the hearing, and has questioned PTAB about its status in following years. He is also familiar with the articles, as they were published under his byline. The anonymous complaint to OEIG, which is referred to in plaintiff's complaint, was mailed to him by an anonymous source whom he has not identified. An accurate copy of the complaint and its mailing envelope is attached to the affidavit.

¶ 19        Based on the information contained in the OEIG complaint, Mr. Novak filed a request with PTAB pursuant to the Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2018)), and PTAB declined to provide the requested information in a letter dated January 21, 2020, naming plaintiff as one of the decisionmakers who declined to provide the requested information. Mr. Novak also attempted to obtain an official statement for attribution from the Governor's communication director, Emily Bettner, confirming an ongoing investigation into allegations of improper political motivations, and received the following statement, which was quoted in the February articles:

> "The administration is determined to get to the bottom of this situation and will ensure a thorough investigation is conducted. PTAB should take no action until an investigation is complete. In general, it would be entirely inappropriate for a legal decision on a property tax appeal to be impacted on any of the conduct alleged in this complaint, including the allegations of political motivations improperly driving the decision making."

¶ 20        Mr. Novak's declaration states that, based on the foregoing, defendants were able to report official confirmation of an investigation and the language he used in the February articles used conjecture and colloquialisms to summarize for their lay readership the incomplete investigation described by the Governor's communication director. With regard to the October articles, Mr. Novak noted that they included an official statement from PTAB that it would not discuss the merits of the OEIG investigation until it had been completed. Mr. Novak stated he believed all facts he reported were true at the time, no facts have been provided to him since that time to contradict the reporting, and he reported the investigations into PTAB proceedings as a matter of public concern because they involved the assessment of taxes for properties associated with the president of the United States, the OEIG complaint, and the fact that the PTAB appeal had remained pending for more than

10 years.

¶ 21                              2. OEIG Complaint

¶ 22       Based on the postmark on the envelope, the OEIG complaint was mailed to Mr. Novak on December 23, 2019. It is made on the form "Complaint" published by the OEIG (Office of Exec. Inspector Gen., Form 300.4A (rev. Feb. 2016)). It is made by "Anonymous" and dated November 13, 2019. It is made against several employees of PTAB, including plaintiff, in regard to the May 2012 appeal of the 2011 assessment of Trump Tower by the Cook County Board of Review (Board of Review). The OEIG complaint is summarized as follows.

¶ 23       ALJ Simeon Nockov conducted a hearing on the assessment appeal on December 12, 2017. Katherine Patti, who was deputy chief ALJ at the Des Plaines office, as well as ALJ Jennifer Vesely, assisted Nockov in all aspects of the appeal, including writing the decision that found that the subject property did not warrant an assessment reduction. On January 31, 2018, Nockov entered his written decision for presentation to the PTAB for approval. Shortly thereafter, plaintiff, who was then chairman of PTAB, told Steven Waggoner, the acting executive director and chief ALJ, that he wanted a large reduction in the assessment because the owner of the property was the president of the United States. Waggoner then told Nockov that he should withdraw his written decision and rewrite it to give a large assessment reduction to "Make America Great Again." Nockov complied with Waggoner's command and withdrew his written decision.

¶ 24       According to the OEIG complaint, plaintiff was appointed executive director of PTAB in March 2019. Nockov consulted with Patti and Vesely and, with their help, rewrote large portions of the decision to comply with Waggoner's political directives and rule on "a small assessment reduction" in the rewritten decision. Nockov entered the rewrite on June 29, 2018. However, later that day, an employee of the Springfield office of PTAB was instructed by Waggoner to withdraw Nockov's rewritten decision by "reserving" the decision in the PTAB database. Shortly thereafter, Waggoner took over the case as the ALJ in charge of writing the decision and, despite having not been present at the hearing, found the property warranted a large assessment reduction by many millions of dollars, "consistent with [plaintiff]'s directive." Waggoner entered his written decision in PTAB's

database on April 29, 2019. However, plaintiff decided that it was not the right time to publish Waggoner's decision, so Waggoner instructed a Springfield employee to withdraw it from the database on May 7, 2019. The OEIG complaint states that, at the time of its filing, the decision had not been entered and submitted to PTAB for approval.

¶ 25    The OEIG complaint states that "unethical political activities and conflicts of interest" were perpetrated by Waggoner, plaintiff, and those PTAB employees who participated in their scheme. It states that "the facts show that Waggoner, for prohibited political reasons, made sure that the decision in the Trump Tower Chicago appeal would result in a large reduction" and "[plaintiff], Nockov, Patti, and Vesely participated in this scheme." Further, it asserts that Nockov, Patti, and Vesely violated the ALJ code of professional conduct by failing to disclose any of Waggoner's conduct and their many communications with him, thus using Waggoner's unlawful political pressure and ethical lapses as leverage to protect them from disciplinary actions.

¶ 26                              3. Circuit Court's May 25, 2021, Order

¶ 27    On May 25, 2021, the Cook County circuit court entered a detailed written order granting in part and denying in part defendants' motion to dismiss. As to the defamation counts, the circuit court found plaintiff adequately pled the falsity of certain statements in the articles, by exaggerating the scope of the investigation along with plaintiff's authority over PTAB's deliberative process, contrary to the substance of the OEIG complaint. These statements include the following: (1) plaintiff was under investigation for having pressured his staff to cut the president a break and rule in the president's favor in the Trump Tower appeal, (2) plaintiff rejected PTAB's staff's decision to deny Trump any refund, and (3) plaintiff directed that a legal decision in the Trump Tower appeal be driven by political motivations rather than the merits of the case. The circuit court found that whether these statements were "substantially true" was a question for the trier of fact because a reasonable jury could find that the statements made the "gist" of the OEIG complaint worse by exaggerating plaintiff's involvement in the purported scheme. The circuit court also found plaintiff adequately pled special damages.

¶ 28    The circuit court rejected the motion to dismiss based on the fair report privilege defense raised by defendants for similar reasons, finding that a question of fact remained as to whether the articles conveyed an erroneous impression to the ordinary reader regarding the allegations against plaintiff as raised in the OEIG complaint. Similarly, the issue of actual malice remained as a question of fact. As to the false light claims, the circuit court found special damages were sufficiently alleged, as with the defamation counts.

¶ 29    Turning to the intentional infliction of emotional distress count, the circuit court agreed with defendants that plaintiff failed to adequately plead facts to support a claim that defendants engaged in extreme and outrageous conduct amounting to "abuse of power" and granted the motion to dismiss that count without prejudice, allowing plaintiff to replead that count, if at all, within 28 days. The motion to dismiss with respect to the defamation and false light counts was thus denied, and plaintiff did not amend the complaint to restate that claim.

¶ 30    C. Defendants' Second Motion to Dismiss

¶ 31    On July 28, 2021, defendants filed a "Motion to Dismiss Pursuant to the Illinois Citizen Participation Act Or, Alternatively, Reconsider Denial of Motion to Dismiss Pursuant to Section 2-619.1." In this pleading, defendants argued, for the first time, that plaintiff's lawsuit is a SLAPP because the claims raised by plaintiff are based solely on defendants' constitutionally protected political speech activities, that plaintiff's claims are meritless, and that plaintiff filed them in retaliation for their exercise of their rights. In support of their argument that the claims raised by plaintiff are meritless, defendants reiterated the arguments made in the first motion to dismiss, that the statements made in the articles were substantially true, were protected by the fair report privilege, were made without actual malice, and caused no special damages. Also, defendants argued the truth of the statements could be inferred by the fact that plaintiff failed to attach the OEIG complaint to his complaint.

¶ 32    In addition to the foregoing, defendants argued the statements are reasonably capable of innocent construction. Defendants argued that, because plaintiff's claims are meritless, it follows that the claims were brought with a retaliatory motive and thus constitute a SLAPP subject to dismissal pursuant to section 15 of the Act. 735

- 10 -

ILCS 110/15 (West 2020). For the same reasons, defendants alternatively urged the circuit court's reconsideration of its prior order denying the first motion to dismiss. The same exhibits were attached to the second motion to dismiss as were attached to the first motion.

¶ 33                    D. PTAB's Final Administrative Decision on the
                                   Trump Tower Appeal

¶ 34        On June 8, 2021, PTAB issued its final administrative decision on the Trump Tower Appeal, which plaintiff attached to his response to defendants' second motion to dismiss. According to this decision, the appeal involved a portion of the Trump International Hotel and Tower, comprising 836,662 square feet, or 32% of its building area, which is broken into more than 50 parcels, each with its own assessed value. PTAB considered a detailed appraisal submitted by the appellant, and the Board of Review did not submit a competing appraisal nor witnesses to refute the valuation presented by the appellant. Rather, the Board of Review submitted comparable sales that PTAB found should be afforded little weight. Nevertheless, PTAB found the appellant's appraisal undervalued the property by about 12%. PTAB concluded that the correct assessment of the value of the property in 2010 was $9.24 million, as opposed to the assessment established by the Board of Review, which was $15,604.993. The Board of Review petitioned the appellate court for direct administrative review of the decision on July 9, 2021.[1]

¶ 35                    E. Publication of Redacted Version of
                                   OEIG Final Report

¶ 36        On September 29, 2021, defendants filed a motion to supplement the second motion to dismiss with a publication by the Executive Ethics Commission of the State of Illinois, titled *In Re: Mauro Glorioso*, Case #19-02400: "Publication of Redacted Version of OEIG Final Report" (Final Report). Exec. Ethics Comm'n of the State of Ill., *In re Glorioso, Publication of Redacted Version of OEIG Final*

---

[1]The Appellate Court, First District, affirmed PTAB's decision by an order filed April 4, 2023, finding the decision was not against the manifest weight of the evidence. *Cook County Board of Review v. Illinois Property Tax Appeal Board*, 2023 IL App (1st) 210799-U, ¶¶ 1-2. The Board of Review did not seek leave to appeal to this court.

*Report* (Sept. 9, 2021), https://oeig.illinois.gov/content/dam/soi/en/web/oeig/
investigations/documents/investigative-reports/19-02400-glorioso-1-0.pdf [https://
perma.cc/TY4M-JMG4]. Much of the Final Report is redacted because the redacted
material related to allegations OEIG determined to be unfounded, which included
all allegations regarding the anonymous complaint. The Final Report indicates that
on October 14, 2020, OEIG received a second complaint relating to the Trump
Tower PTAB appeal. Specifically, that complaint alleged that on October 5, 2020,
plaintiff improperly deleted all of his e-mails related to that appeal, as well as
additional files from both his assigned PTAB computer and officewide computer
systems.

¶ 37    The Final Report states that on the date plaintiff was alleged to have improperly
deleted e-mails and other files, PTAB internally announced that plaintiff would be
leaving the agency later that month. When an unnamed employee began preparing
a packet of electronic materials for the incoming executive director, he accessed
plaintiff's network drive to find that it was "virtually empty." The employee found
this to be suspicious because a few days prior, another unnamed PTAB employee
reported that plaintiff improperly transferred some e-mails. The Department of
Innovation and Technology was able to recover thousands of deleted e-mails, with
more than 200 of them related to the Trump Tower PTAB appeal. From a review
of the e-mails, however, OEIG determined that these materials did not affect the
outcome of the investigation into the anonymous complaint because they were
identical or highly similar to materials previously obtained during the investigation
or related to FOIA requests from news sources to PTAB regarding the investigation.

¶ 38    As a result of its investigation, OEIG concluded the allegations contained in the
original anonymous complaint were unfounded but that allegations that plaintiff
violated PTAB policy, directives, and state law relating to the maintenance of
records by deleting PTAB files and e-mails in October 2020 were founded. Because
plaintiff is no longer a state employee, OEIG recommended that a copy of the Final
Report be placed in plaintiff's employment file and that he not be rehired by the
State.

¶ 39    In a public response to the redacted report dated September 9, 2021, plaintiff
through counsel stated that plaintiff knew that his e-mails had been backed up by
the PTAB technology department when he deleted them from his local inbox and

further that he had been told by the OEIG investigator that OEIG did not need any further materials. He stated that he neither intended to destroy nor actually destroyed any e-mails or files upon departing from PTAB and that he fully cooperated with the OEIG investigation into the anonymous complaint. He requested that the Final Report not be published or be further redacted.

¶ 40                    F. Circuit Court's Ruling on Defendants' Second
                                       Motion to Dismiss

¶ 41        On October 29, 2021, the circuit court entered a detailed written order denying defendants' second motion to dismiss plaintiff's complaint as a SLAPP and their alternative motion to reconsider the ruling on defendants' second motion to dismiss. The circuit court found that defendants' contention that plaintiff's complaint is a SLAPP was properly raised in their initial motion to dismiss, rather than in a second motion in tandem with a motion to reconsider. Further, the circuit court found defendants failed to meet their burden to establish that plaintiff's lawsuit is a SLAPP subject to dismissal. Specifically, citing *Goral v. Kulys*, 2014 IL App (1st) 133236, ¶ 32, it found no showing that defendants' publication of the articles was "in furtherance of their right to petition, speak, associate, or otherwise participate in government to obtain favorable government action." In addition, the circuit court found that defendants failed to meet their burden to establish that plaintiff's complaint is meritless and retaliatory. See *id.* ¶ 8.

¶ 42        In addition, the circuit court found, for the same reasons stated in its order denying defendants' first motion to dismiss, that it was not clear from the pleadings that plaintiff's claims lack merit. The circuit court reiterated that the truth of whether plaintiff was under investigation by OEIG did not establish lack of merit, because the complaint alleges that the articles made false statements regarding the extent of plaintiff's role in the allegations being investigated in light of the allegations relative to the other PTAB employees that were implicated in the anonymous complaint, as well the reason plaintiff was fired by PTAB. In sum, the circuit court again held that the substantial truth of the statements in the articles, as well as application of the innocent construction doctrine and fair report privilege, remained questions of fact. For these reasons, the circuit court denied the second motion to dismiss. Defendants filed a petition for leave to appeal the portion of the

order that denied the second motion to dismiss based on the Act, pursuant to Illinois Supreme Court Rule 306(a)(9) (eff. Oct. 1, 2020), which the appellate court granted.

¶ 43                                    G. The Appellate Court Decision

¶ 44         The appellate court affirmed the circuit court's order denying defendants' second motion to dismiss. 2023 IL App (1st) 211526, ¶ 68. Applying this court's decision in *Sandholm v. Kuecker*, 2012 IL 111443, the appellate court found that the circuit court correctly applied the test set forth therein to determine that the instant lawsuit is not a SLAPP. 2023 IL App (1st) 211526, ¶¶ 42-66. As to the first element, the court considered whether defendants met their burden of showing the sole purpose of their publication of the articles was to exercise their right to participate in government to procure favorable governmental action. *Id.* ¶¶ 51-56. The court noted precedent finding that a newspaper's investigatory reporting on the activities of government fell into the activities protected by the Act but found major distinctions between those activities and the publication of the articles. *Id.* ¶ 53 (citing *Ryan v. Fox Television Stations, Inc.*, 2012 IL App (1st) 120005). Because the articles were published as news, rather than editorial or opinion pieces presenting the thoughts or stance of the writer, and had no bearing on any election, the court found that whether procuring favorable governmental action was the purpose of the articles remained an unsettled issue of fact. *Id.*

¶ 45         Turning to the second element of the *Sandholm* test, the appellate court agreed that whether plaintiff's complaint is filed solely based on defendant's exercise of political rights requires a showing that the suit is both meritless and retaliatory. *Id.* ¶ 56 (citing *Sandholm*, 2012 IL 111443, ¶ 34). With regard to lack of merit, the appellate court agreed with the circuit court, finding as follows:

        "We find that [defendants'] reporting could reasonably be read as not fair, accurate, or truthful by creating the implication that [plaintiff] was more culpable in the alleged activity than the anonymous complaint claimed, both in terms of his supposed actions and his supposed authority over PTAB employees. These are questions of fact that allow [plaintiff's] complaint to survive the pleading stage. Defendants have failed to meet their burden of proving that [plaintiff's] lawsuit is meritless." *Id.* ¶ 59.

¶ 46    Turning to the issue of whether defendants showed that plaintiff's complaint is retaliatory, the appellate court noted that this issue concerns whether plaintiff's goal in filing the lawsuit was to seek damages for the harm caused to his reputation and character or whether the sole intent was to chill defendants' rights of petition and speech related to participation in government. *Id.* ¶ 61. The court noted precedent that identified two factors considered on this issue: (1) the timing of the lawsuit and (2) the relationship between damages requested and the injury. *Id.* (citing *Ryan*, 2012 IL App (1st) 120005, ¶ 23). In evaluating these factors, the appellate court concluded that defendants failed to show plaintiff's lawsuit is retaliatory. *Id.* ¶ 64. Because it found in favor of plaintiff on both elements constituting defendants' initial burden to show the lawsuit is a SLAPP, the appellate court affirmed the circuit court's judgment. *Id.* ¶ 68.

¶ 47    Justice Hyman dissented, asserting that appellate decisions since *Sandholm* have strayed from its reasoning and erroneously required that a lawsuit be " 'meritless and retaliatory' " in order to be dismissed as a SLAPP. *Id.* ¶ 73 (Hyman, J., dissenting). The dissent painstakingly outlined the origins of the test and its application by the appellate court in order to show that the retaliatory requirement has no basis, will encourage the filing of SLAPPs, and is unworkable. *Id.* ¶¶ 76-86. In Justice Hyman's view, the articles were clearly published in sole furtherance of government participation because they reported on government malfeasance and were "undeniably newsworthy and of interest to the public," which could lead to reform. *Id.* ¶¶ 94-95. This court allowed defendants' petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Oct. 1, 2021)) and allowed the Reporters Committee for Freedom of the Press and various other media organizations to file a joint *amicus* brief in support of defendants' position. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 48                                    II. ANALYSIS

¶ 49    Before this court, defendants assert that the courts below erred in their application of the *Sandholm* decision, which resulted in the denial of defendants' second motion to dismiss plaintiff's complaint. The second motion to dismiss, brought pursuant to section 2-619 of the Code (735 ILCS 5/2-619 (West 2020)), asserted that defendants are immune from plaintiff's complaint by virtue of the Act

(735 ILCS 110/1 *et. seq.* (West 2020)). Our review of a decision to deny a motion to dismiss is *de novo*. *Sandholm*, 2012 IL 111443, ¶ 55.

¶ 50                                    A. The *Sandholm* Decision

¶ 51        In *Sandholm*, the supreme court outlined the history and purpose of anti-SLAPP legislation such as the Act and reviewed the provisions of the Act in detail. *Id.* ¶¶ 33-40. We decline to repeat that outline in its entirety but reiterate that SLAPPs are " 'lawsuits aimed at preventing citizens from exercising their political rights or punishing those who have done so' " by using " 'the threat of money damages or the prospect of the cost of defending against the suits to silence citizen participation.' " *Id.* ¶ 33 (quoting *Wright Development Group, LLC v. Walsh*, 238 Ill. 2d 620, 630 (2010)). The purpose of the Act is " 'to strike a balance between the rights of persons to file lawsuits for injury and the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government.' " *Id.* ¶ 36 (quoting 735 ILCS 110/5 (West 2008)).

¶ 52        The court in *Sandholm* found that the threshold determination to be made in considering whether a lawsuit is subject to dismissal under the Act is to determine whether the lawsuit is, in fact, a " '*meritless, retaliatory* SLAPP' " meant "to chill participation in government through delay, expense, and distraction." (Emphasis in original.) *Id.* ¶¶ 44-45 (quoting *Walsh*, 238 Ill. 2d at 633). Toward this end, the court construed the phrase "based on, relates to, or is in response to" in section 15 of the Act (735 ILCS 110/15 (West 2008)) to require that the lawsuit is "*solely* based on, relating to, or in response to 'any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government.' " (Emphasis in original.) *Sandholm*, 2012 IL 111443, *¶* 45 (quoting 735 ILCS 110/15 (West 2008)). Thus, the court found that a defendant's initial burden as the moving party is to show the true goal of the lawsuit is to "chill participation in government or to stifle political expression," rather than to seek damages for personal harm from the defendants' tortious acts. *Id.* ¶ 57. If defendants are able to make the aforementioned showing, plaintiff can only survive dismissal by proving, by clear and convincing evidence, that defendants' acts of petition, speech, or assembly, which are the subject of the lawsuit, were "not

- 16 -

genuinely aimed at procuring favorable governmental action." 735 ILCS 110/15 (West 2020); see *id.* § 20(c).

¶ 53    Under principles of *stare decisis*, we are duty bound to follow the analysis set forth in *Sandholm*, absent special justification, good cause, or compelling reasons for departing from or overruling its holding. See *Vitro v. Mihelcic*, 209 Ill. 2d 76, 82 (2004). This is especially true in the context of statutory construction because a departure from a precedent construing a statute " 'amounts to an amendment of the statute itself rather than simply a change in the thinking of the judiciary with respect to common law concepts which are properly under its control.' " *People v. Espinoza*, 2015 IL 118218, ¶ 29 (quoting *Froud v. Celotex Corp.*, 98 Ill. 2d 324, 336 (1983)). Moreover, "[w]here the legislature chooses not to amend a statute after a judicial construction, it will be presumed that it has acquiesced in the court's statement of the legislative intent." *Miller v. Lockett*, 98 Ill. 2d 478, 483 (1983). Here, there has been no amendment to section 15 of the Act since the *Sandholm* decision, and we find it is improper to depart from or overrule this precedent. Thus, pursuant to *Sandholm*, defendants have the initial burden to show plaintiff's lawsuit was initiated solely to interfere with defendants' protected rights. *Sandholm*, 2012 IL 111443, ¶ 45.

¶ 54                               B. The "Post-*Sandholm*" Test

¶ 55    The appellate court has consistently employed a three-part, post-*Sandholm* test to determine whether a lawsuit is subject to dismissal pursuant to the Act. See, *e.g.*, *Hammons v. Society of Permanent Cosmetic Professionals*, 2012 IL App (1st) 102644, ¶ 18; see also *Prakash v. Parulekar*, 2020 IL App (1st) 191819, ¶ 34. Pursuant to the post-*Sandholm* test, the movant has the burden to show that (1) the movant's acts were in furtherance of his rights to petition, speak, associate, or otherwise participate in government to obtain favorable government action and (2) plaintiff's claims are *solely* based on, related to, or in response to the movant's exercise of these rights. *Prakash*, 2020 IL App (1st) 191819, ¶ 34. If the movant meets its burden under the first two prongs, in order to defeat the motion, plaintiff must prove by clear and convincing evidence what is considered the third prong of the test: that the movant's acts were not *genuinely* aimed at procuring favorable government action. *Id.*

¶ 56　　　We recognize that the parties differ as to whether the second prong of the post-*Sandholm* test requires defendants to show that the lawsuit is meritless, retaliatory, or both. In addition, this issue was a major focus of Justice Hyman's dissent. However, the parties also disagree on whether defendants met their burden under the first prong, which requires defendants to establish their publication of the *articles* was "in furtherance" of their "rights of petition, speech, association, or [to] otherwise participate in government." See *id.*; see also *Walsh*, 238 Ill. 2d at 635-36.

¶ 57　　　The appellate court found defendants were unable to establish that the articles were published in furtherance of their rights to participate in government as required by the first prong of the post-*Sandholm* test (2023 IL App (1st) 211526, ¶ 53 (majority opinion)) but nevertheless continued its analysis and concluded defendants also did not show that plaintiff's lawsuit is solely based on, related to, or in response to defendants' exercise of those rights, as is required by the second prong (*id.* ¶¶ 55-64). We note that, if plaintiff's claims do not involve defendants' exercise of protected rights, which are "in furtherance" of government participation, no further analysis of plaintiff's claims is necessary. In other words, if defendants fail to meet their burden on either of the first two prongs of the post-*Sandholm* test, plaintiff's lawsuit is not subject to dismissal as a SLAPP under the Act.[2] Thus, we now turn to the first prong and examine the nature of the articles to determine if defendants met their burden to show they were published "in furtherance" of their protected activities.

---

[2]In *Sandholm*, 2012 IL 111443, ¶ 5, the plaintiff's complaint was based on various statements made by the defendants as part of their campaign for the school board to remove him as a high school basketball coach. These included a letter posted on a website, e-mails and letters to board members, a petition to the school board, radio interviews, comments on a news website, and comments that were included in a news article. *Id.* ¶¶ 6-19. The appellate court found these acts were in furtherance of the defendants' rights to participate in the school board's hiring decision, which is a government process. *Id.* ¶ 28. The supreme court's decision assumes the propriety of this finding and holds that more is required to prove the lawsuit is a SLAPP. *Id.* ¶ 57. Thus, it is not inconsistent with *Sandholm* for this court to inquire into the nature of defendants' acts as a preliminary matter. See, *e.g.*, *Hammons*, 2012 IL App (1st) 102644 (defendants' statements on a message board disparaging plaintiff's permanent makeup practices and skin pigment products were not aimed at procuring favorable government action and thus were not subject to dismissal pursuant to the Act).

¶ 58                    C. The First Prong of the Post-*Sandholm* Test

¶ 59            1. Acts "in Furtherance of Government Participation"

¶ 60        As we have stated, the first prong of the post-*Sandholm* test requires defendants to show that the movants' acts were in furtherance of their rights to petition, speak, associate, or otherwise participate in government to obtain favorable government action. *Prakash*, 2020 IL App (1st) 191819, ¶ 34. Defendants argue that, because the articles are "investigative reports" about the activities of a public official within a government agency, they address a matter of public concern and thus constitute "acts in furtherance of [defendants'] right to petition, speak, associate, or otherwise participate in government" within the meaning of section 15 of the Act. See 735 ILCS 110/15 (West 2020). Plaintiff disagrees, arguing that an act of petition, speech, or association is not in furtherance of the right to participate in government within the meaning of section 15 unless it is aimed at procuring favorable government action or outcome. We agree with plaintiff. The Act's plain language encompasses acts of "participation in government" and does not contain language extending such protection to speech regarding matters of public concern that do not amount to "government" participation.

¶ 61            2. The Objective Component of the "Sham Exception"

¶ 62        As we have stated, in *Sandholm*, 2012 IL 111443, ¶ 45, the supreme court reversed the appellate court's decision on the basis of what is now considered the second prong of the test, which considers whether the lawsuit is solely based on defendants' protected acts or whether it is a genuine attempt at recovering damages for defendants' tortious acts. Nevertheless, we find a portion of the appellate court's analysis in *Sandholm*, which was unrelated to the supreme court holding and thus not addressed, instructive as this court considers an appropriate standard for evaluating whether defendants' acts meet the second prong of the Act. See *Sandholm v. Kuecker*, 405 Ill. App. 3d 835, 856-65 (2010). Before the appellate court in *Sandholm*, the plaintiff argued that the "acts in furtherance of government participation" portion of the Act should be read to cover only acts performed during a government proceeding. *Id.* at 856. In rejecting plaintiff's argument, the appellate court noted the immunity afforded by section 15 of the Act was negated by proof that defendant's acts were not "genuinely aimed at procuring favorable government

- 19 -

action, result, or outcome," which is what we have identified as the third prong of the "post-*Sandholm*" test. See *id.* at 856-57.

¶ 63 In considering the statutory language, the appellate court found its meaning ambiguous in that it did not specify whether the motivation for the defendant's acts is to be considered on an objective or subjective basis. *Id.* The court then examined the Act's legislative history and found that the legislature, in enacting section 15, intended to adopt the "*Noerr-Pennington* doctrine," which had originated and evolved in federal cases that considered the viability of antitrust claims that involved a defendant's exercise of its rights to petition the government. *Id.* at 857-60 (citing *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), and *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991)).

¶ 64 The antitrust activity at issue in *Noerr* was a negative publicity campaign instituted by a group of railroad companies against the trucking industry, which the plaintiff truck drivers alleged was designed to damage the industry. *Id.* at 860 (citing *Noerr*, 365 U.S. at 129). The railroad companies admitted they conducted the campaign but averred that the campaign was an effort to encourage that state laws be enacted regarding truck weight limits and tax rates. *Id.* (citing *Noerr*, 365 U.S. at 144). The United States Supreme Court rejected the antitrust claim, holding that federal antitrust legislation did not regulate political activity because to hold otherwise would be an unconstitutional infringement on the railroads' right to petition government. *Id.* (citing *Noerr*, 365 U.S. at 144). This holding was again applied in *Pennington* to grant antitrust immunity to coal companies and unions who petitioned the Department of Labor to establish minimum wages for competing contractors and later was expanded to administrative proceedings in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972). *Sandholm*, 405 Ill. App. 3d at 860 (citing *Pennington*, 381 U.S. at 660).

¶ 65 Importantly, the *Noerr* Court limited its holding that actions of government petition were exempt from antitrust actions to enunciate what has come to be called the "sham exception," which mandated enforcement of antitrust laws against a defendant who used government participation as a façade to cover up an attempt to interfere with a competitor's business. *Id.* The Court further explained the

application of the "sham exception" in *Omni Outdoor Advertising*, a case that was referenced in legislative debate prior to adoption of the Act. *Id.* at 860-61 (citing *Omni Outdoor Advertising*, 499 U.S. at 367-68, 380-81). This evolved into a two-part test, which contains both an objective and subjective component aimed at determining when protected government activity would nevertheless be actionable based on federal antitrust laws. *Id.* at 861 (citing *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 52, 60-61 (1993)).

¶ 66        Based on the legislative history and language of the Act, which mirrored the "sham exception," the appellate court in *Sandholm* concluded that, in analyzing whether a defendant's acts are in furtherance of government participation within the meaning of the Act, an adaptation of the two-part test for the "sham exception" is appropriate. *Id* at 862. However, we depart from that decision's discussion of how the subjective and objective components of the exception are to be applied when determining whether dismissal of a lawsuit is required under the Act. See *id.* at 862-63 (applying the objective component of the exception and finding that a subjective analysis is only required if the objective component is not satisfied).

¶ 67        The objective component of the "sham exception" considers whether an objective person would find the defendant's acts are reasonably calculated to elicit favorable government action or outcome. *Id.* at 863-64. We find this component is reflected in what has become the first prong of the post-*Sandholm* test for evaluating a motion to dismiss, which considers whether the defendant's acts are to be considered "in furtherance of government participation," and hereby adopt it as the appropriate standard for making such a determination.[3] Thus, we hold that the first prong of the test requires a court to consider whether an objective person would find the acts were reasonably calculated to elicit a favorable government action or outcome. Having set forth the appropriate standard on the first prong of the post-*Sandholm* test, we must apply it to defendants' acts of publishing the articles.

_____

[3]The subjective component of the "sham exception" is reflected in the third prong of the post-*Sandholm* test, which requires plaintiff to prove that defendants' acts were not genuinely aimed at procuring a favorable government outcome, in order to avoid dismissal, should defendants make the required showing on the first two prongs. See *Prakash*, 2020 IL App (1st) 191819, ¶ 34.

- 21 -

¶ 68                    3. Media Activities Under the First Prong of the Post-*Sandholm* Test

¶ 69          Applying the above-stated standard for determining whether defendants have met their burden under the first prong of the post-*Sandholm* test, we conclude that an objective person would not find defendants' publication of the articles was reasonably calculated to elicit favorable government action or outcome, and thus defendant did not publish them "in furtherance" of government participation within the meaning of section 15 of the Act. 735 ILCS 110/15 (West 2020). A comparison of defendants' publication of the articles to the media activities found to be within the purview of the Act by the appellate court in the wake of *Sandholm* illustrates that this finding is not in conflict with those cases and highlights the factors to be considered in making an objective determination regarding the purpose of those activities under the first prong of the test.

¶ 70          Defendants cite two cases in support of their position that publication of the articles constitutes an act in furtherance of government participation to be protected by the Act. The first is *Ryan*, 2012 IL App (1st) 120005, ¶ 1, wherein a Chicago news station aired an investigative report on the working hours of judges in the circuit court of Cook County. The report was a collaborative effort between the news station and a nonprofit advocacy group concerned with government efficiency. *Id.* ¶ 2.

¶ 71          The multi-installment news report included a firsthand account of investigative efforts prompted by a revelation from unofficial logs prepared by the Cook County Sheriff's Department that many courtrooms were closed before 4 p.m. daily. *Id.* Investigators confirmed this finding by surveying courtrooms and using hidden cameras to document judges leaving the courthouse. *Id.* The report included an analysis of the cost to taxpayers of the Cook County judicial system, including judicial salaries and benefits, and reactions to the investigation from members of the judiciary and the public and actions the chief judge took to remedy the situation as revealed by the report. *Id.* ¶¶ 3-8. Before the final installment, one of the judges surveilled in the report filed a single-count complaint of defamation seeking $7 million in damages. *Id.* ¶ 7. The defendants filed a motion to dismiss pursuant to the Act, which the circuit court denied, and the appellate court allowed the defendants' petition for leave to appeal. *Id.* ¶ 10.

¶ 72   In reversing the circuit court and finding the complaint subject to dismissal pursuant to the Act, the appellate court recognized its first step was to determine if " 'the defendants' acts were in furtherance of their right to petition, speak, associate, or otherwise participate in government to obtain favorable government action.' " *Id.* ¶ 18 (quoting *Hammons*, 2012 IL App (1st) 102644, ¶ 18). In so doing, the court found that the defendants' actions "indisputably" satisfied this "first prong" of the test, explaining:

> "The investigatory report that defendants produced uncovered questionable activity by members of the judiciary in the performance of their official duties. Defendants communicated the findings of their investigation to the public and to members of local and state government via a televised newscast. Perhaps most importantly, the report sought comment from the Illinois Supreme Court and [Cook County] Chief Judge Evans on the investigation's findings and urged them to take action. Such activity is well within the scope of the Act, and in fact the investigatory report at issue here is an excellent example of the kind of activity that the legislature sought to protect, as shown by the Act's own language." *Id.* ¶ 19.[4]

¶ 73   The second case relied upon by defendants on the issue of whether the articles constituted acts in furtherance of government participation is *Goral*, 2014 IL App (1st) 133236, ¶¶ 1-3, in which an Internet blogger authored articles questioning whether a candidate for alderman was qualified to run for office by outlining concerns about the candidate's possible misuse of the homestead property tax exemption. The blogger noted that property tax records showed the candidate claimed a homestead exemption at an address other than the one she listed on her campaign website. *Id.* ¶ 3. The article noted that, if the candidate lived at this other property address, she would not meet the resident requirements for the office of alderman in the ward in which she was running. *Id.* The article stated that the blogger had shared the information he had uncovered with the Cook County assessor's office and the Cook County state's attorney. *Id.* Finally, the article noted

---

[4]The court went on to determine, however, that defendants were unable to show that the plaintiff's lawsuit was "solely based" on the protected acts as required by *Sandholm* because, although they had shown retaliatory intent regarding the timing of the lawsuit and the requested damages, they did not show the lawsuit was meritless because they were unable to disprove any element of plaintiff's claims, specifically that the statements in the report regarding plaintiff were true. *Ryan*, 2012 IL App (1st) 120005, ¶¶ 20-30.

that the candidate's husband claimed exemptions on two residences and stated the amount of taxes he had saved as a result. *Id.*

¶ 74        After the candidate lost the election, the blogger authored a follow-up article detailing a conversation the blogger had with the assessor's office, in which he was informed that the candidate and her husband's residences were flagged as "denied" until they proved where they actually lived. *Id.* ¶¶ 3-4. Approximately one month later, the candidate filed a lawsuit for defamation against the blogger. *Id.* ¶ 5. While the suit was pending, the candidate filed a statement of candidacy for state representative in the next primary election. *Id.* ¶ 8. The circuit court ultimately granted the blogger's motion to dismiss pursuant to the Act and entered a final and appealable finding pursuant to Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)), as the defendant's motion for attorney fees pursuant to section 25 of the Act (735 ILCS 110/25 (West 2010)) remained pending. *Goral*, 2014 IL App (1st) 133236, ¶ 13.

¶ 75        On appeal, the appellate court recognized that the parties had stipulated that the first prong of the test for determining whether the lawsuit was subject to dismissal under the Act had been established. *Id.* ¶ 36. Because the blogger's articles questioned the candidate's eligibility as alderman, the court agreed they "were written in furtherance of [the blogger's] right to speak and participate in government." *Id.* (citing *Garrido v. Arena*, 2013 IL App (1st) 120466, ¶¶ 3, 5-6, 17)).[5]

¶ 76        Here, according to defendants, the articles, like the televised reports in *Ryan* and the blog articles in *Goral*, are acts publishing "investigatory reports" uncovering questionable activity by government actors and, thus, should be deemed

---

[5]The court went on to determine that the defendant was able to establish the second prong under *Sandholm*, that the candidate's lawsuit was *solely* based on the blogger's exercise of his protected rights, finding that the blogger proved lack of merit (*i.e.*, truth and innocent construction), as well as retaliatory intent based on the timing of the lawsuit related to the posting of the blogger's article and the candidate's campaign for state representative, and the fact that the candidate only claimed damage for political losses rather than economic losses associated with the tax exemptions and her real estate business. *Goral*, 2014 IL App (1st) 133236, ¶¶ 52, 59. Finally, applying the third prong, which shifts the burden to the plaintiff to prove the defendant's acts were not genuinely aimed at procuring governmental action, the court found she had not met her burden, as the articles were aimed at procuring a favorable outcome from the electorate in the alderman race. *Id.* ¶ 63. Thus, the appellate court affirmed the dismissal of the complaint pursuant to the Act. *Id.* ¶ 66.

"acts in furtherance of their right to petition, speak, associate, or otherwise participate in government to obtain favorable government action." See *Ryan*, 2012 IL App (1st) 120005, ¶ 1; *Goral*, 2014 IL App (1st) 133236, ¶ 6. However, the articles are missing the element that the *Ryan* court found to be "[p]erhaps most important[ ]" (*Ryan*, 2012 IL App (1st) 120005, ¶ 19) and which this court finds to be an important factor in applying the objective standard we have enunciated for making these determinations. The televised reports in *Ryan* requested a response from the government on its findings and urged the government to act to remedy the problem. *Id.* Similarly, in *Goral*, the blogger's articles were aimed at the electorate, seeking specific action on the part of voters rejecting the candidate's run for alderman. *Goral*, 2014 IL App (1st) 133236, ¶¶ 1-3. In contrast, here, the articles contain no language specifically requesting a response or reaction from a government entity or employee, nor do they seek any specific action on the part of the voting public.

¶ 77     In addition, we find the televised news segments in *Ryan* and the blog articles in *Goral* constituted true "investigatory reports" in that the defendants were giving firsthand reports about investigations in which they were directly involved. See *Ryan*, 2012 IL App (1st) 120005, ¶¶ 1-8; *Goral*, 2014 IL App (1st) 133236, ¶¶ 1-6. In contrast, here, an objective person would find the purpose of the articles was to report on the facts and contents of a written complaint and resulting investigation that was being conducted by a third party, OEIG, which was in no way involved in the production of the articles. Rather than being an "investigatory report" as the term was used by the *Ryan* court, the news articles here were reporting the news about an investigation. The articles did not constitute a firsthand account of an investigation conducted by defendants into government activities, and an objective reader would consider the purpose of the articles was to report the news, rather than to elicit a particular action on the part of government or the electorate.

¶ 78     Of the cases interpreting the Act since its inception, few have involved motions to dismiss brought by media defendants regarding news publications. This is not surprising, considering the public policy stated in section 5 of the Act. 735 ILCS 110/5 (West 2020). The declared policy of the Act is to protect "the constitutional rights of citizens and organizations to be involved and participate freely in the process of government." *Id.* While section 5 speaks to the vitality of "[t]he information, reports, opinions, claims, arguments, and other expressions provided

by citizens" (*id.*), nowhere in section 5, or anywhere else in the language of the Act, is there any mention of news media or the freedom of the press. This is not to minimize or understate the importance of the press and other news media in our democracy. Our jurisprudence is replete with privileges and other protections designed to protect these concerns, many of which remain at issue in this lawsuit. We are simply holding that the Act specifically protects government *participation* and does not encompass all media reports on matters of public concern as advocated by defendants.

¶ 79                                III. CONCLUSION

¶ 80     For these reasons, we find that the articles do not constitute acts in furtherance of government participation and thus plaintiff's claims are not subject to dismissal pursuant to the Act.[6] Accordingly, we affirm the appellate court's judgment and remand to the circuit court for further proceedings on plaintiff's complaint.

¶ 81     Affirmed and remanded.

¶ 82     JUSTICE ROCHFORD took no part in the consideration or decision of this case.

---

[6]In light of the objective standard that we have set forth in this opinion, we overrule the portion of the appellate court's opinion that found that the issue of whether the articles were published in furtherance of government participation remained a question of fact. See 2023 IL App (1st) 211526, ¶ 53. Of course, this is of no consequence because the appellate court's judgment is affirmed, and this case is remanded to the circuit court for further proceedings with the issue of the applicability of the Act fully resolved.